**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re EBC I, f/k/a ETOYS, INC., | Chapter 11 |
| Reorganized Debtor. | Case No. 01-0706 (MFW) |
| | |
| EBC I, f/k/a ETOYS, INC., | |
| Plaintiff, | Adv. Proc. No. 03-50003 (MFW) |
| v. | |
| AMERICA ONLINE, INC., | |
| Defendant. | |

**MOTION FOR LEAVE TO APPEAL**

Pursuant to 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003(a), defendant America

Online, Inc. ("AOL")[1] respectfully moves the District Court for leave to bring an interlocutory

appeal from the Order entered by the Bankruptcy Court on December 7, 2006, which granted in

part the Motion for Summary Judgment filed by the plaintiff and entered judgment in favor of

the plaintiff on Count I of the Complaint.[2]  The Bankruptcy Court's decision represents a

dramatic and unprecedented expansion of the law of fraudulent conveyance.  If left unreviewed,

the decision would have far reaching implications for parties who conduct business with troubled

companies.  Because the question presented is a pure question of law whose resolution now

---

[1] Subsequently renamed AOL LLC.

[2] Pursuant to Bankruptcy Rule 8003(a)(4), the Bankruptcy Court's December 7, 2006 Opinion
and Order are attached hereto as Exhibits A and B.

could avoid the need for a potentially lengthy trial involving complex factual questions, granting AOL leave to bring an immediate interlocutory appeal is appropriate.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In August 1999 AOL and eToys, Inc. entered into an agreement (as amended in November 2000, the "1999 Marketing Agreement") under which AOL promised to provide Internet marketing and promotional services to eToys. eToys thereafter filed for bankruptcy protection. EBC I, the plaintiff in this action, is a litigation trust that has succeeded to causes of action held by eToys. It brought suit against AOL on January 3, 2003, seeking to recover payments that eToys had made to AOL under the 1999 Marketing Agreement prior to the eToys bankruptcy filing.

EBC I's complaint asserted various legal theories, including breach of contract, unjust enrichment, fraudulent conveyance under state law, and that certain events relating to the payments and the contract were fraudulent conveyances that could be avoided under Section 548 of the Bankruptcy Code. After a period of motions practice and discovery, in May 2004 the parties filed cross-motions for summary judgment on the controlling issues of law.

While various of EBC I's claims have been abandoned or were dismissed as a matter of law, the Bankruptcy Court accepted EBC I's novel argument that AOL's pre-bankruptcy termination of the eToys contract, pursuant to its express terms, constituted a "transfer of an interest of the debtor in property" that is avoidable under Section 548. The Bankruptcy Court ordered further evidentiary hearings to be held to establish the value of the interest in property it believed was transferred by the termination.

AOL respectfully submits that the District Court should grant leave for an immediate appeal of the Bankruptcy Court's Order, for the following reasons:

*First*, the Bankruptcy Court's judgment is based on a controlling question of law as to which there is a substantial ground for difference of opinion. Numerous prior cases have held that a pre-petition termination of a contract pursuant to its terms does not constitute a "transfer" of "property" for purposes of Section 548. This conclusion is compelled by the fundamental nature of contract rights. The benefits of a contract come only with its corresponding obligations and conditions. While a contract, taken as a whole, may properly be viewed as an asset, the conditional rights of one party to receive future performance from the other do not constitute a form of property independent of the remaining obligations and conditions of the contract. The Bankruptcy Court acknowledged the body of case law holding to this effect, but declined to follow that precedent. Instead, the Bankruptcy Court's Opinion announces a new principle of law to the contrary. Our research suggests that this is the first case in which any court has ever held that a debtor's loss of rights to future performance, resulting from termination of a services contract, can be treated as a fraudulent conveyance under Section 548. This issue clearly is controlling, and there unquestionably is substantial ground for difference of opinion, given the Bankruptcy Court's radical—and acknowledged—departure from prior case law.

*Second*, granting leave to appeal now will materially advance the termination of the litigation. By hearing this appeal, the District Court can resolve this pure issue of law at a time when its ruling may save the parties and the Bankruptcy Court from undertaking further protracted evidentiary proceedings.

*Finally*, this case presents the extraordinary circumstance where there will be no detriment or prejudice to any party by granting leave for appeal. The plaintiff, EBC I, is not an operating company. It exists solely to pursue claims such as that filed against AOL. This case has been pending for nearly four years. There is no current litigation activity and nothing is

presently pending.  The evidentiary hearings contemplated by the Bankruptcy Court and other subsequent proceedings will take further extended time periods.  No party has any immediate need for relief or any interest that will be significantly affected by allowing an appeal now, instead of later.  In this context, the normal concerns associated with interlocutory appeal— the adverse effects of piecemeal litigation—do not pertain.

## QUESTION PRESENTED ON APPEAL

This case arises out of a services contract that permitted the services provider to terminate the contract under specified circumstances.  The question presented in this appeal is whether—in the absence of any finding that the debtor received less than full consideration when it *entered into* the contract granting the service provider the right to terminate—the service provider's *exercise* of its previously granted contractual right to terminate the contract can constitute a fraudulent conveyance under Section 548 of the Bankruptcy Code.

## RELIEF SOUGHT ON APPEAL

AOL seeks an Order from the District Court reversing the Bankruptcy Court's entry of judgment for the plaintiff on Count I of the Complaint, and directing the entry of summary judgment in favor of AOL.

## STATEMENT OF FACTS

Pursuant to the 1999 Marketing Agreement AOL promised to provide branding, marketing services and Internet on-screen promotions, known as "impressions," to eToys during the period August 1999 through August 2002.  In exchange, eToys originally promised to pay AOL the total amount of $18 million, in twelve quarterly payments of $1.5 million each.  (1999

Marketing Agreement § 4.1.)[3] eToys expressly agreed that these payments would be "non-refundable." (EBC I's Resp. to AOL's Req. for Admission No. 5.) eToys also expressly agreed that AOL's obligations to continue providing marketing services were contingent on eToys staying in business. (1999 Marketing Agreement § 5.6.) Either party had the right to terminate in the event that the other party became insolvent or ceased to do business in the normal course. (*Id.*)

On November 15, 2000, eToys and AOL amended the 1999 Marketing Agreement to resolve issues relating to the sufficiency of AOL's prior performance (the "Amendment"). (*See* Lenk Dep. Ex. 10.) The parties agreed to reduce eToys's payment obligations and to modify the marketing services to be delivered by AOL. (EBC I's Resp. to AOL's Req. for Admission No. 20.) The Amendment did not alter any of the other previously agreed terms of the 1999 Marketing Agreement, including the non-refundable payment provision or the termination clause. (Amendment § 8.a; *see* Brine Dep. 102:17-103:1; Baig Dep. 122:8-13, 124:2-4; Valle Dep. 71:15-22.)

eToys's financial position deteriorated rapidly beginning in December 2000 due to decreasing sales. In February 2001 eToys announced termination of the employment of all of its employees and stopped paying past due debts. (Lenk Dep. Exs. 12 and 13; Schoch Dep. Exs. 8 and 9; EBC I's Resp. to AOL's Req. for Admission Nos. 51 and 52.) On February 26, 2001, eToys issued a press release announcing that its liabilities exceeded its assets, that it would file for bankruptcy in the near future, and that it would close its website within one or two weeks. (Lenk Dep. Ex. 15.) Pursuant to the terms of the 1999 Marketing Agreement (as amended), on

---

[3] Citations to factual materials provided herein are to the record below, which shall be transmitted to this Court in the event this motion is granted.

February 28, 2001, AOL sent eToys written notice of the immediate termination of the contract. (Schoch Dep. Ex. 13; AOL's Resp. to EBC I's Req. for Admission No. 11.)

In its Complaint and Motion for Partial Summary Judgment, EBC I argued that *termination* of the 1999 Marketing Agreement (as amended) pursuant to its express terms by AOL on February 28, 2001, was itself a "transfer" of eToys's "property" for which reasonably equivalent value was not received, and therefore that the termination is avoidable under Section 548(a)(1)(B) of the Bankruptcy Code. In its Cross-Motion for Summary Judgment, AOL relied on a number of cases in which courts held that pre-petition termination of a contract pursuant to its terms did not constitute a transfer of any right and had, thus, refused to extend Section 548(a)(1)(B) to avoid such terminations. In addition, AOL noted that to its knowledge, no court has ever held that termination of a services contract, as opposed to contracts involving interests in real property, constituted an avoidable transfer of a property interest. Despite these precedents, in its December 7, 2006 Order, the Bankruptcy Court held that termination of the 1999 Marketing Agreement (as amended) by AOL pursuant to its terms was a transfer of eToys's property and ordered an evidentiary hearing to determine the value to be recovered.

## ARGUMENT

28 U.S.C. § 158(a)(3) provides that, with leave of a district court, a bankruptcy court's interlocutory order may be reviewed in the district court. "The district court has broad discretion in determining whether to exercise jurisdiction over interlocutory appeals from the bankruptcy court." *Dan Valley Excavating, Inc. v. Residential Funding Corp.* (*In re United Homes of Michigan, Inc.*), No. 01 C 8896, 2002 WL 126518, at *1 (N.D. Ill. Jan. 30, 2002) (attached as Exhibit C); *see also Sheehan ex rel. O'Brien v. Richardson*, 315 B.R. 226, 234 (D.R.I. 2004) (noting the district court's "broad jurisdictional discretion provided by [28 U.S.C.] § 158").

In considering whether to permit an interlocutory appeal, many courts have looked to the criteria set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from district courts to the courts of appeals. *See Enron Corp. v. Springfield Assocs., L.L.C.* (*In re Enron Corp.*), No. 01-16034, ADV. 05-01025, ADV. 05-01029, ADV. 05-01074, ADV. 05-01105, M-47(SAS), ADV. 05-010, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006) (noting that [28 U.S.C.] § 1292(b) allows for interlocutory appeal where the order at issue "'(1) involve[s] a controlling question of law (2) over which there is substantial ground for difference of opinion,' and the movant [can] also show that '(3) an immediate appeal would materially advance the ultimate termination of the litigation'") (quoting 28 U.S.C. § 1292(b)) (attached as Exhibit D); *see also Official Bondholders Comm. v. Chase Manhattan Bank* (*In re Marvel Entm't Group*), 209 B.R. 832, 837 (D. Del. 1997) (referring to courts' application of § 1292(b) criteria when considering whether to permit appeals of bankruptcy orders).

Here, the Bankruptcy Court's summary judgment order turns on a controlling question of law about which there is substantial ground for a difference of opinion. Hearing an appeal related to the order could avoid the need for a potentially complex and protracted evidentiary hearing. And under the circumstances of this case, a further delay in the bankruptcy proceedings while this Court considers an appeal would cause no material prejudice to the parties. AOL respectfully requests that the Court grant it leave to appeal.

## I.    THE BANKRUPTCY COURT'S JUDGMENT IS BASED ON A CONTROLLING QUESTION OF LAW AS TO WHICH THERE IS A SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION

### A.    The Court's Entry of Judgment Was Based On a Pure Issue of Law

The Bankruptcy Court held that AOL's exercise of its contractual rights to terminate its agreement with eToys is avoidable under Section 548. Specifically, the Bankruptcy Court held that a debtor's pre-petition contractual rights to receive future services are a form of "property

rights," entirely distinct from the debtor's obligations and bargained for conditions in the same contract. (Op. at 20.)

"A controlling question of law [includes] at the very least a ruling which, if erroneous, would be reversible error on final appeal." *Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group)*, 209 B.R. 832, 837 (D. Del. 1997) (citing *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974)). There can be no question that the question presented in this appeal is a controlling interpretation of law. If the District Court were to conclude, consistent with the general view of the law of fraudulent conveyance prior to this opinion, that a party's *exercise* of rights previously granted to it under a services contract cannot represent a fraudulent conveyance, so long as the *granting* of those rights was within an agreement under which reasonably equivalent value was exchanged, Count I of the Complaint would be dismissed. As such, the question presented here is controlling.

### B. This Ruling Is In Direct Conflict With a Substantial Body of Case Law Holding That Pre-petition Termination of a Contract Pursuant to Its Terms Does Not Constitute a Transfer Under Section 548

As AOL noted in its Brief in Support of its Motion for Summary Judgment, a number of cases addressing the issue have held that the pre-petition termination of a contract pursuant to its terms does not amount to a transfer as defined by Section 548(a)(1)(B). *See Edwards v. Federal Home Loan Mortgage Corp.* (*In re LiTenda Mortgage Corp.*), 246 B.R. 185, 191 (Bankr. D.N.J. 2000) ("[A] pre-petition termination of a contract pursuant to its terms and the consequent cessation of a debtor's rights under a contract does not constitute a transfer within the meaning of . . . [11 U.S.C.] § 548(a).") (citing cases), *aff'd*, 276 F.3d 578 (3d Cir. 2001) (Table); *see also Sullivan v. Willock* (*In re Wey*), 854 F.2d 196, 199 (7th Cir. 1988) (holding that forfeiture of down payment when final payment could not be paid pursuant to terms of contract did not constitute a transfer); *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.* (*In re Coast*

8

*Cities Truck Sales, Inc.*), 147 B.R. 674, 677-78, (D.N.J. 1992) (determining that "Coast Cities possessed no rights as a matter of law which it could relinquish since the contract between Navistar and the debtor had expired by its own terms" pre-petition; holding that expiration of contract was not a transfer under Section 548), *aff'd*, 5 F.3d 1488 (3d Cir. 1993) (Table); *Creditors' Comm. v. Jermoo's Inc.* (*In re Jermoo's Inc.*), 38 B.R. 197, 203-06 (Bank. W.D. Wis. 1984) (finding no transfer under Section 548 where franchisor terminated franchise-dealership contracts pre-petition pursuant to provision in contracts that permitted termination by franchisor if franschisee did not cure dishonored checks within five days of receiving notice).

In reaching the opposite conclusion, the Bankruptcy Court relied on a series of cases that all involved contractual rights to *interests in real property*, such as leases, land sales installment contracts, and franchise agreements. (*See* Op. at 8-9.) Property interests are expressly addressed in Section 548, which is why those cases reached the results they did. In this case, however, there is no interest in tangible property of any kind. Not only is the Opinion in conflict with the case law in other jurisdictions, it appears to be the first instance in which a court has *ever* held that Section 548 applies to a debtor's pre-petition rights under a contract that provides only for the receipt of services.

In these circumstances, there clearly is substantial ground for a difference of opinion warranting a permissive appeal. Courts have held that substantial ground for a difference of opinion exists where a bankruptcy court's order is in conflict with other court decisions, as well as where authority does not address the particular issue and merely provides a backdrop that demonstrates that the question is unsettled. In *In re GroupHealth Partnership, Inc.*, No. 92-0124, 1992 WL 96333, at *2 (E.D. Pa. Apr. 21, 1992) (attached as Exhibit E), the district court granted leave to appeal a bankruptcy court's opinion and order holding that a health maintenance

organization ("HMO") was not outside the scope of Chapter 11 of the Bankruptcy Code because it did not qualify as a domestic insurance company.  The district court held that a substantial ground for difference of opinion was presented because the would-be appellee had cited "two cases in which courts concluded that HMOs were domestic insurance companies for the purposes of the bankruptcy code."  *Id.*; *see also Beatty v. U.S.A.* (*In re Beatty*), No. IP 01-1582-C-T/K, 2002 WL 535316, at *1 (S.D. Ind. Feb. 27, 2002) ("[T]here is a substantial ground for difference of opinion on these issues as evidenced by the case law support found by Defendant and the bankruptcy judge's contrary opinion.") (attached as Exhibit F); *U.S.A. v. Tomlin* (*In re Tomlin*), Nos. Civ. 2:00-CV-1161-T, 3:99-35175-HCA-7, 2000 WL 1909912, at *1 (N.D. Tex. Nov. 21, 2000) (noting that references in cited precedents to executor's duty to hold estate in trust did not specify the extent to which a fiduciary duty was owed and, since no current authority focused on the specific issue, defendant had satisfied the requirement that there be a substantial ground for a difference of opinion) (attached as Exhibit G).

AOL respectfully submits that the basis for the Bankruptcy Court's Opinion is in conflict with other precedent and that, in ruling that pre-petition termination of a contract for services constitutes a transfer that can be avoided pursuant to Section 548, the Bankruptcy Court expanded the coverage of Section 548 to an issue never before precisely addressed.  Thus, substantial ground for a difference of opinion exists.

### C.    If Allowed to Stand, the Principle of Law Created in the Bankruptcy Court's Opinion Could Have Massive Implications in Future Bankruptcy Cases

Large corporate debtors typically experience substantial changes in rights under contracts in the period preceding a bankruptcy filing.  A debtor's deteriorating condition often leads to material breaches of existing contracts, such as financial defaults, operational defaults, failure to deliver promised goods or services, violation of covenants, and numerous other material events

of non-performance.  In turn, those breaches result in additional remedies and rights being made available to the contract counter parties, including rights to receive penalties and other payments, rights to additional security, acceleration of obligations, triggering of protective provisions and contract termination.   All of these events could be viewed as a "transfer" of some "rights" a debtor had pre-bankruptcy.  However, these events have never before been viewed as giving rise to a fraudulent conveyance action under Section 548 with respect to contracts for services.  This is because, in the case of a contract, the "transfer" of value—the exchange of consideration— took place *at the time the contract was entered into*.   As long as the debtor received reasonable consideration at the time the contract was executed, and under the contract taken as a whole, the value of its rights going forward necessarily is dependent on its obligations and on the conditions that were bargained for in the contract.

The Bankruptcy Court in the present case effectively held that a debtor's pre-petition contract benefits should be valued without regard to the corresponding contract obligations and terms.  It went on to hold that, to the extent the debtor was deprived of any of the value of those benefits for any reason at a time when it was insolvent, Section 548 supports recovery against the counter party.  Such a holding would radically alter the law of fraudulent conveyance.

In this case, the debtor had paid AOL consideration for a long-term Internet marketing services contract.  It is undisputed that the debtor received, in addition to individual advertising impressions, the benefits of being identified as AOL's primary sponsored retailer for toys and baby products.   AOL agreed to this sponsorship, but in so doing it required as a condition that eToys remain in business.  This was critically important to AOL.   It obviously did not want to sponsor and facilitate sending AOL members to make purchases at a retailer that would not deliver on purchases.  Thus, AOL insisted on the right to terminate if eToys declared itself

insolvent. eToys bargained for this result, and there is no finding, nor could there be, that eToys did not receive good consideration when it made that bargain.[4] Yet the Bankruptcy Court ignored the terms agreed to by the parties and would compensate eToys without regard to contract rights and obligations that were bargained for and supported by an exchange of fair consideration.

If left to stand, the Bankruptcy Court's new rule of law ultimately would result in a practice where corporate debtors would review all contractual events occurring after a date of arguable insolvency, and would file actions for any significant asserted effects on their rights under contract clauses that previously had been bargained for. Not only would such a result be contrary to the Bankruptcy Code and the prior case law, it would be unworkable.

## II.    PERMITTING AN APPEAL WILL MATERIALLY ADVANCE THE TERMINATION OF THIS LITIGATION

An appeal serves to materially advance termination of the litigation when "resolution of a controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004); *see also Official Comm. of Unsecured Creditors v. Qwest Commc'ns Corp.* (*In re A.P. Liquidating Co.*), 350 B.R. 752, 756 (E.D. Mich. 2006) (finding requirement for material advancement satisfied based on plaintiffs' contention that an immediate appeal would avoid a bench trial that might be overturned on appeal, thereby saving "court resources and the parties' time and expenses"); *Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group)*, 209 B.R.

---

[4] Contrary to the Bankruptcy Court's view, eToys's announcement that it would discontinue its operations was a breach of the 1999 Marketing Agreement that was material to AOL. *Cf.* Op. at 12. Allowing eToys to continue marketing to AOL's customers after it was clear that eToys would not deliver products ordered by those customers would have posed a significant threat to AOL's reputation and business.

832, 837 (D. Del. 1997) (noting that an appeal might materially advance termination where "a decision by this court that the bankruptcy court erred would obviate the need for the bankruptcy court to conduct a fact-intensive hearing").

Allowing an appeal at this time to obtain a ruling on the controlling issue of law similarly will materially advance the termination of this litigation. If this Court concludes that the Bankruptcy Court erred, the result will be that the parties and the courts will avoid substantial additional evidentiary proceedings.

While the Bankruptcy Court ruled in favor of EBC I on the core legal issue, it noted that the parties had not presented sufficient evidence to determine the value of the services allegedly transferred. Accordingly, the Bankruptcy Court held that further evidentiary hearings will be held on the valuation issues. (Op. at 21.) Such proceedings, if held, would be complex and potentially lengthy.

Section 548 provides for the avoidance of transfers of property that lack consideration at a time when a debtor was insolvent. Here, the Bankruptcy Court found that eToys had a property interest in future Internet advertising services to be provided by AOL, in the form of impressions that would be shown to AOL's members. Even if the Bankruptcy Court were correct in its interpretation of the law, eToys would be entitled to recover only that "interest in property" to which it was entitled under the contract—i.e., some number of future internet advertising impressions.

Determining the value of such impressions, however, would be complex. As an initial matter, the Bankruptcy Court would need to determine how many advertising impressions were yet to be delivered by AOL as of February 28, 2001. There is no question that AOL performed substantially over the holiday season from November 2000 through January 2001, but that

number may be subject to evidentiary disputes, particularly given that nearly six years have lapsed.

Even more difficult would be the question of how to value those impressions. eToys had contract rights to receive the impressions at a time when the "dot com" economy was crashing, and the value of the impressions was far lower than in earlier periods. The question of value would necessarily have to be addressed through expert testimony.

In addition, it is uncertain what scenario the Bankruptcy Court would have to assume for purposes of the valuation proceeding. Because eToys went out of business, it is clear that it would not have used the impressions itself if AOL had not terminated the contract. At best, if there had been no termination, eToys would have attempted to sell those rights (assuming that were permissible under Section 365 of the Bankruptcy Code) to others in its Chapter 11 proceeding, perhaps in late 2001 or 2002. Certainly the amount that a third party would have paid at that point would have been a fraction of the initial contract price, which would introduce another factor for debate in conducting a valuation of eToys's remaining rights to impressions under the contract.

The evidentiary proceeding contemplated by the Bankruptcy Court on these issues would be complicated and expensive. Both parties, as well as the Bankruptcy Court, will benefit by having the controlling question of law determined by this Court prior to the further investment of such resources. If, as is likely, this Court reverses the Bankruptcy Court, those costs will be avoided altogether.

III.    **THIS CASE PRESENTS THE EXCEPTIONAL CIRCUMSTANCE WHERE AN APPEAL WILL RESULT IN NO SIGNIFICANT DETRIMENT TO ANY PARTY**

Courts generally are reluctant to permit interlocutory appeals of lower court rulings, because of the delay and prejudice to opposing parties that can result from piecemeal disposition. *See Colonial Bank v. Freeman* (*In re Pacific Forest Prod. Corp.*), 335 B.R. 910, 919 (S.D. Fla. 2005). In this case, however, there is no significant detriment posed by an appeal on the central legal issue. The lack of any prejudice to the plaintiff, combined with the importance of the legal issue and novelty of the Bankruptcy Court's ruling, constitute extraordinary circumstances supporting immediate appellate review.

eToys filed its Chapter 11 bankruptcy petition on March 7, 2001. After the filing, it shut down its business operations and implemented a liquidation of its assets in an effort to pay creditors. That strategy was implemented through a plan of reorganization proposed by eToys that was confirmed by the Bankruptcy Court and became effective on November 5, 2002 (the "Plan").

Pursuant to the Plan, EBC I, as successor to eToys, and its affiliated debtors and debtors-in-possession, were substantively consolidated. *See* Bankr. Docket # 1142, First Amended Plan, Article VI. EBC I's primary activities under the Plan were to prosecute litigation claims of the debtors and to complete the transfer of assets of the estate to holders of allowed claims. *See id.* Section 5.1. Future recoveries resulting from litigation claims would also be distributed to holders of allowed claims. *Id.*

EBC I filed its complaint against AOL on January 3, 2003. After a period of motions practice and discovery, the parties filed cross-motions for summary judgment with briefing completed in June 2004. In the two and one-half years since that time, there has been no litigation activity. There is no activity currently scheduled. To our knowledge, EBC I does not

15

have any operations. Neither it, nor the creditors that would ultimately recover funds in the unlikely event that the Bankruptcy Court's ruling stands, will incur any incremental detriment as a result of the delay that would occur by permitting this appeal—a delay which likely will not be significant given the more than four year history of this litigation.

While bankruptcy policy generally favors rapid resolution of disputes to maximize realization of assets and increase payments to creditors, in this case, whatever asset may be available is not wasting. If the case proceeds in the Bankruptcy Court, it is likely that there would be an appeal in any event, so the overall difference in time would not be expected to be significant. And if the debtor believes time is of the essence, AOL would be amenable to an agreement to expedite the appeal. Given the significant potential for reversal, it actually is in the interest of the creditors to take the time to resolve the issue now, rather than having the estate bear the cost of an expensive trial that ultimately may have been unnecessary.

In balancing the factors for consideration of a requested appeal, then, the current circumstances present the extraordinary case where there is no significant downside. On the other hand, as noted above, there is a strong likelihood that an appeal would provide the significant benefit of clarifying the controlling legal issue in advance of further extended evidentiary proceedings.

**CONCLUSION**

For the foregoing reasons, AOL respectfully requests that it be granted leave to appeal the Bankruptcy Court's December 7, 2006 Opinion and Order.

Dated: December 18, 2006                Respectfully submitted,


                                        /s/ Christina M. Thompson
                                        Karen C. Bifferato (Bar #3279)
                                        Marc J. Phillips (Bar #4445)
                                        Christina M. Thompson (Bar #3976)
                                        CONNOLLY BOVE LODGE & HUTZ LLP
                                        The Nemours Building
                                        1007 North Orange Street, P.O. Box 2207
                                        Wilmington, DE  19899-2207
                                        Tel: (302) 658-9141
                                        Fax: (302) 658-5614

                                        James R. Wrathall
                                        Amanda L. Major
                                        WILMER CUTLER PICKERING HALE AND
                                               DORR LLP
                                        1875 Pennsylvania Avenue, N.W.
                                        Washington, DC  20006
                                        Tel: (202) 663-6000
                                        Fax: (202) 663-6363

                                        *Attorneys for America Online, Inc.*

EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| ――――――――――――――――― | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ――――――――――――――――― | | |

### OPINION[1]

Before the Court is a Motion for Partial Summary Judgment
filed by EBC I, Inc., f/k/a eToys, Inc. (the "Debtor") and a
Motion for Summary Judgment filed by America Online, Inc.
("AOL"). For the reasons set forth below, the Court will grant,
in part only, AOL's Motion for Summary Judgment and dismiss
Counts IV and V of the Complaint. The Court will also grant, in
part, the Debtor's Motion for Partial Summary Judgment on Count
I.

――――――――――――――――

[1] This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

PDF created with pdfFactory trial version www.pdffactory.com

I.    BACKGROUND

On March 7, 2001, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.  On that same day, the Debtor ceased operations and shut down its website.  All the Debtor's assets were subsequently liquidated.

Prior to the bankruptcy filing, the Debtor and AOL had executed a contract dated August 10, 1999 (the "Contract"), under which AOL committed to provide online advertisements and other services for the Debtor for three years for $18 million, payable in installments.  The Debtor paid $7.5 million through July 2000 in accordance with the Contract, but AOL failed to perform its obligations, providing less than $2.4 million in advertisements. As a result, the Contract was modified on November 15, 2000.  The Debtor paid an additional $750,000 at that time and AOL agreed to provide a  lesser amount of advertisements (worth approximately $6 million) for the following two years without further payments by the Debtor.

On February 26, 2001, the Debtor issued a press release announcing its financial difficulties and intent to file bankruptcy.  Two days later, AOL terminated the Contract pursuant to section 5.6 which allowed termination if the Debtor became insolvent or filed bankruptcy.

On January 3, 2003, the Debtor filed an adversary complaint

2

PDF created with pdfFactory trial version www.pdffactory.com

against AOL seeking (1) to avoid and recover alleged fraudulent transfers pursuant to sections 548 and 544 of the Bankruptcy Code, (2) damages for breach of contract, and (3) equitable relief based on unjust enrichment. According to the Debtor, the payments made under the Contract, the amendment of the Contract, and the termination of the Contract by AOL were all avoidable transfers of property of the Debtor.

AOL filed a motion to dismiss the complaint. At oral argument held on April 30, 2003, the Court granted the motion to dismiss with respect to the unjust enrichment count because the parties conceded that their relationship was governed by the Contract.

On May 14, 2004, the Debtor filed a motion for partial summary judgment, and AOL filed a motion for summary judgment on all counts. The Debtor conceded in its response to AOL's motion for summary judgment that its breach of contract claim and any claim for recovery of payments made under the Contract prior to its amendment on November 15, 2000, should be dismissed.

The motions for summary judgment as they relate to the remainder of the Debtor's claims were taken under advisement. Briefing is complete, and the matter is ripe for decision.

II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (E), (H) & (O).

3

PDF created with pdfFactory trial version www.pdffactory.com

III. DISCUSSION

    A.   Standard for Summary Judgment

    Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the judge's function is . . . to determine if there is a genuine issue for trial." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993).

    The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once the moving party establishes the absence of a genuine issue of material fact, however, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but the

4

PDF created with pdfFactory trial version www.pdffactory.com

adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). See also Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982); Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. Matsushita, 475 U.S. at 587.

B.    Fraudulent Transfer under Section 548(a)(1)(B)

The version of section 548(a)(1) applicable to this case[2] provides that:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily -
>                                                          . . .
>     (B)(i) received less than a reasonably
>     equivalent value in exchange for such
>     transfer or obligation; and

---

[2] Section 548 was modified by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which became effective October 17, 2005, after the instant adversary proceeding was commenced.

PDF created with pdfFactory trial version www.pdffactory.com

> (ii)(I) was insolvent on the date that
> such transfer was made or such obligation was
> incurred, or became insolvent as a result of
> such transfer or obligation . . . .

11 U.S.C. § 548(a)(1)(B) (2004) (amended 2005).  To recover under

section 548, therefore, the Debtor must show that while it was

insolvent there was a transfer of an interest in its property for

less than reasonably equivalent value.

    1.   <u>Insolvency</u>

The term insolvent is defined in the Bankruptcy Code

generally to mean a "financial condition such that the sum of

such entity's debts is greater than all of such entity's

property, at a fair valuation."  11 U.S.C. § 101(32)(A).

AOL contends in its Motion for Summary Judgment that the

Debtor was solvent at the time of the transfers which the Debtor

seeks to avoid.  Therefore, AOL asserts that a crucial element of

the Debtor's case is missing and summary judgment in its favor

should be granted.  Specifically, AOL contends that the Debtor

was solvent until early December 2000 when it finally exhausted

the funds it had raised in its initial public offering and other

equity and debt financing.  AOL supports this contention with the

Debtor's financial records and an expert's opinion.

The Debtor apparently concedes that it was solvent when it

made payments to AOL under the original Contract[3] because it has

_____

    3  The payments under the Contract were made in the amount
of $1.5 million each on September 9, 1999, October 15, 1999,
January 10, 2000, March 24, 2000, and July 13, 2000.

PDF created with pdfFactory trial version www.pdffactory.com

withdrawn its claims that those payments were fraudulent transfers. The Debtor asserts, however, that when the Contract was amended (and it paid $750,000) on November 15, 2000, it was insolvent. It further contends that it remained insolvent through the date the Contract was terminated on February 28, 2001.

AOL asserts that as of November 15, 2000, the Debtor was still solvent. AOL relies on its expert's report to support this conclusion. The Debtor asserts that there are several errors with the expert's conclusion, namely its valuation of the Debtor's inventory, goodwill and intangibles. Consequently, the Court concludes that there is a genuine issue of material fact whether the Debtor was insolvent on November 15, 2000.

AOL concedes, however, that the Debtor was insolvent on February 28, 2001, when it terminated the Contract.[4] Therefore, as to the Debtor's assertion that the termination of the Contract is avoidable as a fraudulent conveyance, there is no genuine issue that the Debtor was insolvent at that time.

2.    Transfer of an "Interest of the Debtor in Property"

In its motion for partial summary judgment, the Debtor seeks a determination that AOL's termination of the Contract, and

---

[4] AOL's termination of the Contract on that date was premised on the Debtor's announcement that it was insolvent. AOL's expert opined that the Debtor became insolvent in early December 2000.

PDF created with pdfFactory trial version www.pdffactory.com

consequently the retention of the payments made by the Debtor in advance for services never delivered, constitutes a fraudulent transfer as a matter of law under section 548.  AOL disagrees, asserting that its termination was proper under the Contract and that no property of the Debtor was transferred as a result of the termination.

        a.    Case Law

    The Debtor argues that courts have consistently recognized that, even when a contract is properly terminated pursuant to its terms, the termination constitutes a fraudulent transfer if the debtor had made payments and acquired rights under the contract which are lost as a result of the termination.  See, e.g., In re McConnell, 934 F.2d 662, 664 (5th Cir. 1991) (holding that down payment on real estate sale contract was a fraudulent transfer when contract was later terminated); In re Ferris, 415 F.Supp. 33, 39 (W.D. Okla. 1976) (holding that termination of lease constituted a transfer of property of the debtor under fraudulent transfer provisions of the former Bankruptcy Act); In re Grady, 202 B.R. 120, 123 (Bankr. N.D. Iowa 1996) (finding that termination of contract for sale of real estate constituted a transfer of debtor's interest in property); In re Bockes Bros. Farms, Inc., Nos. 93-6127KW, 93-60881KW, 1994 WL 910792, at *4-5 (Bankr. N.D. Iowa Jan. 6, 1994) (holding that termination of land contract where debtor had paid all but the final installment,

8

PDF created with pdfFactory trial version www.pdffactory.com

though permitted by the contract, was a fraudulent transfer of property of the debtor); In re Veretto, 131 B.R. 732, 736-37 (Bankr. D.N.M. 1991) (holding that forfeiture of debtor's equity interest under real estate contract was a transfer for purposes of preference and fraudulent transfer claims); In re Indri, 126 B.R. 443, 446 (Bankr. D.N.J. 1991) (concluding that termination of lease was a transfer of property of debtor for purposes of preference and fraudulent conveyance statutes); In re Queen City Grain, Inc., 51 B.R. 722, 726 (Bankr. S.D. Ohio 1985) ("There is just no getting away from the fact that upon the termination of [the debtor's] lease, there was a 'parting with . . . an interest in property,' for after the termination of the lease [the debtor] no longer had an interest in the [property].").

AOL asserts that the cases cited by the Debtor are distinguishable because they all involved contracts for the lease or sale of real estate.  It counters that the termination of a services contract, such as the Contract in this case, does not result in the transfer of any "property right" of the Debtor. See, e.g., Allan v. Archer-Daniels-Midland Co. (In re Commodity Merchs., Inc.), 538 F.2d 1260, 1263 (7th Cir. 1976) (holding that cancellation of contract because of debtor's breach was not a transfer of the debtor's property under the former Bankruptcy Act); Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co. (In re Coast Cities Truck Sales, Inc.), 147 B.R. 674, 677-79

9

PDF created with pdfFactory trial version www.pdffactory.com

(D.N.J. 1992) (concluding that termination of contract pre-
bankruptcy was not a fraudulent transfer under § 548 because
executory contract rights are governed by § 365); Edwards v. Fed.
Home Loan Mortgage Corp. (In re LiTenda Mortgage Corp.), 246 B.R.
185, 191 (Bankr. D.N.J. 2000) (concluding that "pre-petition
termination of a contract pursuant to its terms and the
consequent cessation of a debtor's rights under a contract does
not constitute a transfer within the meaning of either Code §
547(b) or § 548(a)."); Creditors' Comm. v. Jermoo's, Inc. (In re
Jermoo's, Inc.), 38 B.R. 197, 203-06 (Bankr. W.D. Wis. 1984)
(holding that termination of franchise-dealership contracts per
their terms was not a transfer for purposes of fraudulent
transfer statute).

   The Court agrees with the Debtor that the termination of the
Contract by AOL resulted in a transfer of property of the Debtor,
namely the advertising services for which the Debtor had pre-
paid.  The Court disagrees with the conclusion of the cases cited
by AOL that section 548 is not applicable because executory
contracts may be assumed or rejected under section 365.  In fact,
if a contract is terminated pre-petition it is no longer
executory and section 365 is not applicable.  See, e.g., In re C
& S Grain Co., 47 F.3d 233, 237 (7th Cir. 1995) (concluding that
because contracts were terminated pre-petition they could not be
assumed under section 365); Counties Contracting & Constr. Co. v.

10

PDF created with pdfFactory trial version www.pdffactory.com

<u>Constitution Life Ins. Co.</u>, 855 F.2d 1054, 1061 (3d Cir. 1988) (concluding that "[a] contract may not be assumed under § 365 if it has already expired according to its terms.")

Further, there is no language in section 548 to suggest that executory contracts or terminated contracts are not subject to its provisions. In fact, courts have held that the termination of a contract pre-petition can constitute a transfer of property of the estate. <u>See, e.g.</u>, <u>Commodity Merchs.</u>, 538 F.2d at 1263 (stating that if the terminated contracts had been assignable, perhaps the cancellation of them would have been an avoidable transfer); <u>In re Thompson</u>, 186 B.R. 301, 309-10 (Bankr. N.D. Ga. 1995) (concluding that termination of franchise agreement or sublease might be avoidable under section 548 if the debtor had rights under the agreement that could be assigned).

The cases cited by AOL are also distinguishable because they did not involve a pre-paid contract. In those cases, the debtor had breached the contract and, consequently, was not entitled to compel performance by the other party. Therefore, in those cases, it was appropriate to determine that there was no transfer of any interest of value that the debtor had when the contract was cancelled according to its terms. <u>See, e.g.</u>, <u>Commodity Merchs.</u>, 538 F.2d at 1262-63 (commodities trading agreements cancelled as a result of debtor's inability to fulfill its obligations because of its financial difficulties); <u>Coast Cities</u>

11

PDF created with pdfFactory trial version www.pdffactory.com

Truck, 147 B.R. at 675 (contract terminated because of substantial arrears, dishonored checks, and liens placed on assets by other creditors); LiTenda Mortgage Corp., 246 B.R. at 188-89 (contract terminated after audit showed that debtor was using custodial accounts for its own purposes and accounts had a shortfall in excess of $400,000); Jermoo's, Inc., 38 B.R. at 198 (contract terminated after debtor had been in arrears for 18 months and had failed to replace dishonored checks).

In contrast, in this case, the Debtor had not materially breached the Contract. In fact, as a result of the amendment in November 15, 2000, the Debtor had fully paid for all services that AOL was obligated to perform for the next two years under the Contract. Therefore, the Court concludes that the cases cited by the Debtor, rather than those cited by AOL, are more germane to this case.

b.    Property or Contract Rights

The Debtor argues that the loss of its rights under the Contract (to online advertisements) deprived it of valuable property rights. It contends that under Virginia law, contract rights are clearly property rights. See, e.g., Worrie v. Boze, 95 S.E.2d 192, 196 (Va. 1956) ("It is well settled that the right to performance of a contract and the right to reap profits therefrom are property rights which are entitled to protection in the courts.")

12

PDF created with pdfFactory trial version www.pdffactory.com

AOL contends, however, that contract rights are not property rights under Virginia law. See, e.g., Network Solutions, Inc. v. Umbro Int'l, Inc., 529 S.E.2d 80, 86 (Va. 2000). AOL's reliance on Network Solutions is unfounded. The Court in that case found that future Internet services cannot be garnished because they are not a liability, rather than because there were no property rights in the contract to provide those services. Id. at 86. In fact, the Network Solutions Court expressly stated that it was not holding generally that contract rights are not property or are not garnishable. Id. at 87-88.

The Court concludes that, contrary to AOL's assertion, Virginia law does recognize contract rights as property rights. See, e.g., In re Chaves, 335 S.E.2d 97, 103 (Va. 1985) (concluding that tortious interference with contract claim was "an intentional wrong to the property right of another."); Worrie, 95 S.E.2d at 196 (recognizing that contract rights are property rights).

AOL argues nonetheless that there is a fundamental difference between property and contract rights. It asserts that property is a tangible or intangible thing which is subject to ownership to the exclusion of others. In contrast, a contract right is just a promise of future performance which is created and circumscribed by the terms of the contract itself. Only property is recoverable as a fraudulent transfer under section

13

PDF created with pdfFactory trial version www.pdffactory.com

548.  As a result, AOL asserts that the Debtor owned nothing under the Contract except AOL's promise to perform in accordance with the terms of the Contract.  Because the Contract permitted AOL to terminate it as it did, AOL argues that the Debtor has no remaining property rights in the Contract.

The Debtor disagrees, arguing that AOL simply cites general case law which discusses general principles of property rights.  None of the cases cited by AOL address the issue at hand, namely whether contract rights are property for purposes of section 548 of the Bankruptcy Code.  Rather, the Debtor argues that the broad definition of property in section 541 of the Code encompasses contract rights as well as tangible property.

The Court agrees with the Debtor.  Property of the estate is broadly defined by the Bankruptcy Code to include "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. § 541(a)(1) & (7).  The Code expressly excludes from property of the estate any interest in a lease that was terminated at the expiration of its term pre-petition.  Id. § 541(b)(2).  By the plain language of the Code then property of the estate includes any interest a debtor has in a lease that expired pre-petition for reasons other than the expiration of its term.  This is consistent with the case law cited by the Debtor.

14

PDF created with pdfFactory trial version www.pdffactory.com

See, e.g., Ferris, 415 F.Supp. at 39; Indri, 126 B.R. at 446;

Queen City Grain, Inc., 51 B.R. at 726.

Further, property of the estate includes any "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." Begier v. I.R.S., 496 U.S. 53, 58-59 (1990) (noting that property of the estate includes property recoverable as a preference). Courts have held, specifically, that property of the estate includes contract rights. See, e.g., In re Enron Corp., 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) (concluding that employment agreement between debtor and its head of trading was property of the estate subject to the automatic stay); Elder-Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder-Beerman Stores Corp.), 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996) ("Courts have consistently held that contract rights are property of the estate.")

The Debtor also argues that the termination of the Contract in this case was insufficient to deprive the Debtor of its property rights under the Contract by virtue of section 541(c)(1) of the Code. That section provides, in relevant part, that

> an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement . . . or applicable nonbankruptcy law -
> . . .
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title . . . that effects or gives an option to effect a

15

PDF created with pdfFactory trial version www.pdffactory.com

> forfeiture, modification, or termination of
> the debtor's interest in property.

11 U.S.C. § 541(c)(1) (amended 2005). The Debtor argues,
therefore, that the provision of the Contract upon which AOL
relies was not effective to terminate the Debtor's interest in
the advertising services due it under the Contract.

Ipso facto clauses (by which a contract is terminated as a
result solely of the debtor's insolvency or bankruptcy) are
generally disfavored, if not expressly void, under the Bankruptcy
Code. See, e.g., In re James Cable Partners, L.P., 154 B.R. 813,
816 (M.D. Ga. 1993) (referring to "a basic bankruptcy policy that
abhors the operation of so-called 'ipso facto' clauses [that]
trigger a default, forfeiture or termination upon the
happenstance of bankruptcy."); In re Hutchins, 99 B.R. 56, 57
(Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not
favored and are generally unenforceable under the Bankruptcy
Code."). See also 11 U.S.C. § 363(l) (permitting use, sale or
lease of property notwithstanding ipso facto clause), § 365(e)(1)
(providing that an executory contract or unexpired lease may not
be terminated under an ipso facto clause), & § 541(c)(1)
(providing that an interest of the debtor in property becomes
property of the estate notwithstanding any ipso facto clause).

The Court agrees with the Debtor that by virtue of section
541(c)(1) the Debtor's interest in the Contract became property
of the estate notwithstanding AOL's purported termination under

16

PDF created with pdfFactory trial version www.pdffactory.com

section 5.6 of the Contract.  Even if AOL's termination was effective, however, that is irrelevant.  A transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties.  See, e.g., In re R.M.L., Inc., 92 F.3d 139, 148 (3d Cir. 1996) (concluding that non-refundable fees paid pursuant to commitment letter were nonetheless avoidable as fraudulent conveyances because they did not convey reasonably equivalent value on the debtor); Pinto v. Phila. Fresh Food Terminal Corp. (In re Pinto), 89 B.R. 486, 497-98 (Bankr. E.D. Pa. 1988), supplemented by 98 B.R. 200 (Bankr. E.D. Pa. 1988) (concluding that the fact that termination was valid under the contract was irrelevant under section 548).

> Whether the transfer of the Debtor's interest in property was legal or not is irrelevant for the purposes of § 548.  Any otherwise legal transfer may be avoided under § 548 if the requirements of that section are otherwise met, e.g., if the transfer was for less than reasonably equivalent value and rendered the debtor insolvent . . . .

Pinto, 89 B.R. at 497-98 (emphasis in original).

Therefore, the fact that AOL may have had the right to terminate the Contract does not mean that the termination did not effect a transfer of an interest in property of the Debtor for less than reasonably equivalent value.

c.   Equitable Rights

AOL asserts that the Debtor's argument that it has valuable equitable rights under the Contract contradicts the express terms

17

PDF created with pdfFactory trial version www.pdffactory.com

of the Contract which permitted termination and provided that the Debtor's payments were non-refundable.  Further, it argues that, in dismissing the unjust enrichment claim, the Court ruled that the Debtor had no equitable claim.  AOL asserts that the doctrine of law of the case precludes the Debtor from arguing otherwise now.

The Court disagrees.  The dismissal of the unjust enrichment claim, though an equitable claim, did not determine that the Debtor had no rights (equitable or otherwise) under the Contract.

d.   Bankruptcy Policy

AOL also asserts that to allow a debtor to freely reinstate contracts that were terminated pre-petition conflicts with the policy of the Code because it would stretch section 548 beyond its permissible bounds.  The Court disagrees.  Its holding today is not that a debtor can freely reinstate any contract that was terminated pre-petition.  Only a contract whose termination resulted in the loss of valuable property rights of the debtor, such as entitlement to services for which it had paid in advance, is potentially recoverable under section 548.  Cf., Metro Water & Coffee Servs., Inc. v. Rochester Cmty. Baseball, Inc. (In re Metro Water & Coffee Servs., Inc.), 157 B.R. 742, 746-47 (Bankr. W.D.N.Y. 1993) (holding that termination of concession agreement was a transfer for purposes of fraudulent conveyance statute though it was not avoidable because the debtor's material

18

PDF created with pdfFactory trial version www.pdffactory.com

defaults meant it had no legal rights).

There is nothing in the language of section 548 to suggest that contract rights are property that is not recoverable under that section. "The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors." Id. at 747.

AOL argues that it was not "fraud" for the Debtor to be held to the terms of its bargain and that the Court should not engage in a judicial redistribution of consideration under the Contract that in hindsight turns out to be unfavorable to the Debtor. Contrary to AOL's argument, that is exactly what the fraudulent conveyance statute provides: a judicial determination in hindsight which undoes a bargain that the debtor may have made that did not give it reasonably equivalent value. See, e.g., R.M.L., 92 F.3d at 148 (concluding that even though fees were non-refundable, they may still be recoverable if their payment is found to be a fraudulent conveyance). The issue, therefore, is not whether the Contract provided for the payment of non-refundable fees but whether the Debtor received reasonably equivalent value for the payment of those fees. Id.

Accordingly, the Court concludes that the rights which the Debtor had in the Contract to online advertisements were property

19

PDF created with pdfFactory trial version www.pdffactory.com

rights which were transferred by the termination of the Contract
by AOL.  Thus, those rights may be recoverable if the other
requirements of section 548 are met.

    3.   <u>Less than Reasonably Equivalent Value</u>

    The Third Circuit in <u>R.M.L.</u> acknowledged that the
determination of reasonably equivalent value "is exacerbated in
cases where . . . the debtor exchanges cash for intangibles, such
as services or the opportunity to obtain economic value in the
future, the value of which is difficult, if not impossible, to
ascertain." <u>Id.</u>  Nonetheless, the <u>R.M.L.</u> Court affirmed the
bankruptcy court's determination that non-refundable fees paid by
the debtor pursuant to a bank's commitment to lend funds, which
was so contingent as to confer little value on the debtor, was
avoidable as a fraudulent conveyance.  <u>Id.</u>

    The Debtor asserts that it received less than reasonably
equivalent value from the termination of the Contract, because it
had prepaid $8.25 million but had received only $2.3 million in
services.  AOL presents no evidence to establish that it provided
anything more of value to the Debtor.

    In this case, the Court agrees with the Debtor that to the
extent it paid more to AOL than the value of the services
provided to it by AOL, the termination of the Contract eliminated
that value.  At the time the Contract was amended on November 15,
2000, the parties had apparently reconciled the accounts for the

20

PDF created with pdfFactory trial version www.pdffactory.com

first year of the Contract (i.e., through July 2000) and agreed
that AOL had provided $2.3 million in services to the Debtor.
The Debtor has presented no evidence, however, of the amount of
services provided after the first year.  Therefore, the Court is
unable to determine what value in services AOL provided to the
Debtor after the amendment to the Contract.  A further hearing
will, therefore, be scheduled to consider evidence on this point.


IV.   CONCLUSION

     For the foregoing reasons, the Court will grant, in part,
AOL's Motion for Summary Judgment and dismiss Counts IV and V.
The Court will also grant, in part, the Debtor's Motion for
Partial Summary Judgment on Count I.

     An appropriate Order is attached.


Dated: December 7, 2006          BY THE COURT:



                                 Mary F. Walrath
                                 United States Bankruptcy Judge

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | Case No. 01-00706(MFW) |
| | ) | |
| Reorganized Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| EBC I, INC., f/k/a ETOYS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 03-50003 |
| v. | ) | |
| | ) | |
| AMERICA ONLINE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

ORDER

AND NOW, this **7th** day of **DECEMBER, 2006,** upon consideration of the cross motions for summary judgment filed by the parties, and for the reasons set forth in the accompanying Opinion, it is hereby

ORDERED that the Motion for Summary Judgment filed by America Online, Inc., is **GRANTED, IN PART**; and it is further

ORDERED that Counts IV and V of the Complaint are **DISMISSED**; and it is further

ORDERED that the Motion for Partial Summary Judgment filed by the Debtor is **GRANTED, IN PART**; and it is further

ORDERED that judgment in favor of the Debtor on Count I of the Complaint is **ENTERED**; and it is further

**ORDERED** that a further evidentiary hearing will be held on the amount of damages to be awarded to the Debtor.

BY THE COURT:


Mary F. Walrath
United States Bankruptcy Judge


cc:  Richard D. Allen, Esquire[1]

---

1  Counsel shall serve a copy of this Order and the accompanying Opinion on all interested parties and file a Certificate of Service with the Court.

EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

<u>Briefs and Other Related Documents</u>
In re United Homes of Michigan,
Inc.N.D.Ill.,2002.Only the Westlaw citation is
currently available.
   United States District Court, N.D. Illinois, Eastern
Division.
   In re: UNITED HOMES OF MICHIGAN, INC., a
Michigan corporation, Debtor.
DAN VALLEY EXCAVATING, INC., Defendant-
Appellant.
v.
RESIDENTIAL FUNDING CORPORATION,
Trustee of DeMert & Dougherty, Inc., Plaintiff-
Appellee.
**No. 01 C 8896.**

Jan. 30, 2002.

(Appeal From an Order of the United States
Bankruptcy Court for the Northern District of Illinois
in Adv. No. 00 A 1063 (Case No. 00 B 07290)).

MEMORANDUM OPINION AND ORDER
<u>HOLDERMAN</u>, District J.
**\*1** This is an appeal from an interlocutory order of
the Bankruptcy Court of the Northern District of
Illinois. On October 9, 2001, the Bankruptcy Court
entered a Memorandum Opinion and Order finding
plaintiff-appellee's Residential Funding Corporation
("RFC") mortgage lien superior to the construction
lien of defendant-appellant Dan Valley Excavating,
Inc. ("Dan Valley"). For all the following reasons,
the decision of the Bankruptcy Court is AFFIRMED.

BACKGROUND <u>FN1</u>

   FN1. The following facts are taken from the
   Bankruptcy Court's Memorandum Opinion
   and Order of October 9, 2001.

RFC is in the business of lending money for
residential construction. The Debtor, United Homes
of Michigan, Inc., was engaged in the construction
and sale of residential housing. RFC, the Debtor,
along with United Homes, Inc., an Illinois
corporation, United Homes of Illinois, Inc., and
United Homes, Inc., an Arizona corporation,
collectively entered into a loan agreement on May 28,

1996, whereby RFC loaned money to each entity to
build residential homes.

In September 1997, RFC and the Debtor entered into
a supplemental loan agreement enabling the Debtor
to begin the Sienna Pointe Project. The Sienna Pointe
Project involved the acquisition of a 96-lot residential
subdivision which was ultimately divided into two
phases. Phase 1, Sienna Point # 1, consisted of 45
lots. Phase 2, Sienna Point # 2, consisted of 51 lots.
On September 15, 1997, RFC loaned to the Debtor
$1,505,000 to enable the Debtor to acquire both
Sienna Pointe # 1 and Sienna Pointe # 2, and to
develop Sienna Pointe # 1. To secure the loan, the
Debtor granted RFC a mortgage lien on Sienna
Pointe # 1 and # 2. Under the agreement, none of the
loan proceeds could be used to develop Sienna Pointe
# 2. RFC recorded the mortgage in Kent County,
Michigan on September 17, 1997.

Dan Valley is in the business of excavation,
construction and general contracting. Pursuant to a
contract with the Debtor, Dan Valley was the general
contractor for Sienna Point # 2. Dan Valley was not
involved with any part of Sienna Pointe # 1. Dan
Valley began work on Sienna Point # 2 on August 13,
1999. On December 6, 1999, Dan Valley recorded a
construction lien for the work and materials it used
developing Sienna Point # 2.

JURISDICTION

The Bankruptcy Code provides that interlocutory
orders from bankruptcy court may be reviewed with
leave of the district court sitting in its appellate
jurisdiction. *See* <u>28 U.S.C. § 158(a)(3)</u>. The district
court has broad discretion in determining whether to
exercise jurisdiction over interlocutory appeals from
the bankruptcy court. *Id.* The Bankruptcy Code,
however, does not provide any guidance for the
district court in determining when an interlocutory
appeal is appropriate, therefore, the standard set forth
in <u>28 U.S.C. § 1292(b)</u>, which governs interlocutory
appeals from the district court to the court of appeals,
is instructive on the issue. *In re Capen Wholesale,*
*Inc.,* 184 B.R. 547, 549 (N.D.Ill.1995). District courts
applying the standard set forth under <u>§ 1292(b)</u> in
bankruptcy appeals have adopted its three part test.
Under the three part test, an interlocutory appeal is
appropriate when it: (1) involves a controlling
question of law; (2) over which there is substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ground for difference of opinion; and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *In re Capen Wholesale, Inc., 184 B.R. at 549.* Upon review of the record on appeal, this court finds this interlocutory appeal rests on several controlling issues of law and also finds that pursuit of this appeal will materially advance the termination of this litigation as between Dan Valley and RFC. This court finds that resolution of this matter on appeal will not deplete funds from the bankruptcy estate, but instead will expedite the administration of the bankruptcy estate and expedite the ultimate distribution of estate funds to creditors. Accordingly, this court grants Dan Valley leave to appeal in an exercise of its discretion.

## STANDARD OF REVIEW

**\*2** On appeal a district court reviews the factual findings of the bankruptcy court under a "clearly erroneous" standard, but reviews conclusions of law de novo. *Meyer v. Rigdon, 36 F.3d 1375, 1378 (7th Cir.1994); In re Roberson, 999 F.2d 1132, 1134 (7th Cir.1993).* A grant of summary judgment is a conclusion of law and the district court "will uphold the entry of summary judgment 'if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.' ' *Indiana Ass'n of Homes for the Aging Inc. v. Indiana Office of Medicaid Policy & Planning, 60 F.3d 262, 265-66 (7th Cir.1995)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).* A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).* Under the standard for summary judgment, there is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson, 477 U.S. at 249, 106 S.Ct. at 2511.* In reviewing the grant of summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. *Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.*

In reviewing the facts relied upon by the Bankruptcy Court in granting summary judgment, this court will accept the factual determinations of the Bankruptcy Court unless those determinations are either completely devoid of minimum evidentiary support

displaying some hue of credibility or they bear no rational relationship to the supportive evidentiary data. *See United States v. Greer, 53 F.3d 334 (7th Cir.1995)* (citing *Krasnov v. Dinan, 465 F.2d 1298, 1302 (3rd Cir.1972)).* Summary judgment may be affirmed on any ground supported in the record, even if it was not relied upon by the court below. *Johnson v. Gudmundsson, 35 F .3d 1104, 1115 (7th Cir.1994).*

## DISCUSSION

On appeal defendant-appellant argues: (1) the Bankruptcy Court did not have subject-matter jurisdiction over the parties' competing lien claims; (2) the Bankruptcy Court erred in granting summary judgment solely on the issue of lien priority; and (3) the Bankruptcy Court erred in granting summary judgment in favor of RFC where there remains issues of fact regarding when RFC's lien was perfected in comparison to when construction began on Sienna Pointe # 1. The court will address each argument in turn.

### I. The Bankruptcy Court had proper Subject-Matter Jurisdiction

28 U.S.C § 157(b)(1), (b)(2)(A) & (K) provides:
(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection
**\*3** (2) Core proceedings include, but are not limited to-
(A) matters concerning the administration of the estate;
(K) determinations of the validity, extent, or priority of liens;

Dan Valley argues that the Bankruptcy Court did not have subject-matter jurisdiction to hear RFC's complaint because resolution of RFC's complaint would "have absolutely no impact on the United Homes' [Debtor's] estate." Appellant's Brief at 14. Dan Valley asserts that the ranking of competing lien claims will have no impact on the administration of the Debtor's estate since the aggregate amount of secured claims against the estate is fixed at the total amount of sales proceeds. *Id.* In looking at the record on appeal, the controversy between RFC and Dan Valley involves prioritizing lien claims each holds against the Debtor's estate. Accordingly, upon a literal reading of 28 U.S.C. § 157(b)(1) and (b)(2)(K), the dispute between RFC and Dan Valley

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

constitutes a core proceeding that a Bankruptcy judge may hear.

Dan Valley also argues that since the Debtor has staked no claim upon the pool of secured funds at issue in this case, the priority of lien claims against that pool of funds is out of the Bankruptcy Court's purview. Dan Valley cites to *Matter of Xonics, Inc.,* 813 F.2d 127 (7th Cir.1987), *In re Edwards,* 962 F.2d 641, 643 (7th Cir.1992), and *In re Chicago, Rock Island & Pac. R.R.,* 794 F.2d 1182, 1186-87 (7th Cir.1987) in support of this proposition.

All three cases cited by Dan Valley stand for the propositions that bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims against a bankrupt's assets, but that bankruptcy jurisdiction does not follow property once it leaves the estate. *Matter of Xonics, Inc.,* 813 F.2d at 131. In this case, none of the Debtor's property has left the Debtor's estate. Although the pool of secured funds was once real estate, Sienna Pointe # 2, the subsequent sell of the real estate and pooling of the proceeds does not extinguish bankruptcy jurisdiction. Regardless of whether the Debtor has filed a claim for the pool of secured funds, the proceeds are still a part of the estate and the Bankruptcy Court retains the power to adjudicate all claims as to those proceeds. In the *Xonics* case, the debtor satisfied all of its secured claims by abandoning the underlying real property to secured creditors. In the *Edwards* case, the real property at issue had been sold by the debtor free and clear of all liens. In the *Rock Island* case, the dispute in question involved a former tenant of the debtor and the new owner of the underlying real property. In this case, the proceeds from a sale of real estate and those proceeds have not been abandoned by the Debtor and were still a part of the Debtor's estate at the time the Bankruptcy Court rendered its decision prioritizing the lien claims of RFC and Dan Valley. Accordingly, none of the three cases cited by Dan Valley are persuasive. Based upon the facts of this case and 28 U.S.C. § 157(b)(1) and (b)(2)(K), this court finds that the Bankruptcy Court had subject-matter jurisdiction to adjudicate the lien claims of RFC and Dan Valley.

## II. *The Bankruptcy Court properly granted partial summary judgment*

*\*4* Dan Valley argues that the Bankruptcy Court erred when it granted partial summary judgment on the specific issue of lien priority because the granting of partial summary judgment is not possible unless partial summary judgment disposes entirely of one or more counts of a complaint or counterclaim. This novel argument is contrary to Rule 56 of the Federal Rules of Civil Procedure and disposal of this argument need not go any further than the text of the rule. Rule 56(a) of the Federal Rules of Civil Procedure provides:
A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or *any part thereof.* [Emphasis added].

Accordingly, RFC as the plaintiff in the matter could file a motion under Rule 56(a) with the Bankruptcy Court seeking adjudication of lien priority because the issue of lien priority constitutes a part of RFC's overall complaint. Fed.R.Civ.P. 56(a). Furthermore, on plaintiff's motion under Rule 56(a), if judgment was not rendered upon the whole case or for all relief asked for within the motion, the Bankruptcy Court at that time had the power to ascertain which issues were necessarily left and ready for trial. Fed. R. Civ. P 56(d).

## III. *The Merits of the Bankruptcy Court's Ruling*

Finally, Dan Valley argues that the Bankruptcy Court erred in granting summary judgment in favor of RFC where there remains issues of fact regarding (1) the outstanding amount of the loan secured by RFC's mortgage lien; and (2) the extent to which RFC advanced funds to the Debtor after improvements were made on either Sienna Pointe # 1 or Sienna Pointe # 2. Upon review of the record, however, this court finds that there is sufficient evidence in the record to support the grant of summary judgment in favor of RFC. To prevail on summary judgment, RFC had the burden to present sufficient evidence in the record such that when all justifiable inferences were taken in favor of Dan Valley there existed no genuine issue of material fact that RFC's mortgage lien had priority over Dan Valley's construction lien.

The general rule for determining lien priorities is that the lien filed first has priority over those liens which are filed later. *United States v. City of New Britain,* 347 U.S. 81, 85, 74 S.Ct. 367, 370 (1954). Accordingly, to prevail on summary judgment, it was RC's burden to provide evidence proving that their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

lien was filed before Dan Valley's lien. Upon review of the record on appeal, it is undisputed that RFC's lien was filed on September 17, 1997, whereas Dan Valley's lien was filed on December 6, 1999. RFC, therefore, sufficiently carried its evidentiary burden establishing the priority of its lien to that of Dan Valley's lien.

*5 In looking at Dan Valley's response to RFC's motion for summary judgment, this court finds that Dan Valley failed to present sufficient evidence in the record to dispute RFC's evidence of first-in-time such as to create a genuine issue of material fact that its construction lien was actually superior to RFC's lien. Both before the Bankruptcy Court and here on appeal, Dan Valley argues first that there exists an issue of fact as to the outstanding balance of RFC's loan to the Debtor. Upon review of the record, however, there is no evidence which demonstrates how much of RFC's loan was outstanding at the time of summary judgment. Furthermore, there is no evidence in the record which demonstrates how the outstanding balance of RFC's supplement loan to the Debtor relates to whether RFC's lien is superior as to Dan Valley's lien. So even though the amount of RFC's loan outstanding is an issue in this case, this issue has not been proven sufficiently material to prevent the granting of summary judgment. Second, Dan Valley argues that under the Michigan Construction Lien Act. M.C.L. § 570.1101 *et. seq.*[FN2], RFC has failed to carry its evidentiary burden as to when RFC issued its loan to the Debtor in comparison to when Sienna Pointe # 1 was first improved upon and that RFC has failed to carry its evidentiary burden as to the extent RFC advanced funds to the Debtor after Sienna Pointe # 1 was improved. The Michigan Construction Lien Act ("Construction Lien Act") provides in relevant part:

> FN2. Neither party disputes whether this statute governs this controversy.

(2) A construction lien under this act shall take priority over all garnishments for the contract debt made after commencement of the first actual physical improvement, without regard to the date of recording of the claim of lien.
...
(4) A mortgage, lien, encumbrance, or other interest recorded before the first actual physical improvement to real property shall have priority over a construction lien arising under this act. The priority of the mortgage shall exist as to all obligations secured by the mortgage except for indebtedness

arising out of advances made subsequent to the first actual physical improvement. An advance made pursuant to the mortgage, but subsequent to the first actual physical improvement shall have priority over a construction lien if, for that advance, the mortgagee has received a contractor's sworn statement as provided in section 110, has made disbursements pursuant to the contractor's sworn statement, and has received waivers of lien from the contractor and all subcontractors, laborers, and suppliers who have provided notices of furnishing. Mich. Stat. Ann. § 570.1119.

Upon a literal reading of the Construction Lien Act, the Construction Lien Act stands to protect the rights of contractors and labors against further encumbrances on the property attaching after development of the property has commenced. Accordingly, in response to summary judgment it was Dan Valley's burden to bring forth evidence to create a genuine issue of material fact that despite RFC's first filing of its lien, Dan Valley's construction lien is nonetheless superior RFC's lien under the Construction Lien Act. Dan Valley's argument both in response to RFC's motion for summary judgment and here on appeal, however, confuses who's burden it is under the Construction Lien Act to establish the facts necessary to create an issue of fact.

*6 Consistent with its confusion of burdens, Dan Valley has failed to present evidence demonstrating how Dan Valley's lien priority has anything to do with the physical improvement date of Sienna Pointe # 1 since it is undisputed the Dan Valley had no involvement with the development of Sienna Pointe # 1. In response to RFC's motion and here on appeal, Dan Valley simply argues that its construction lien relates back to the date of first actual physical improvement on Sienna Pointe # 1 without any evidentiary support. The Bankruptcy Court, in granting summary judgment in favor of RFC, properly rejected Dan Valley's bare allegations and properly distinguished the cases RFC cited in support of its strained relation-back theory. The undisputed facts in the record establishes that Dan Valley had nothing to do with the improvement or development of Sienna Pointe # 1. Additionally, the undisputed facts establishes that the proceeds of the supplemental loan to the Debtor was to be used exclusively to improve Sienna Pointe # 1 and not for Sienna Pointe # 2. Dan Valley has presented no evidence to contradicted these facts and the Bankruptcy Court properly found that the Sienna

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

<span style="float:right">Page 5</span>

Pointe Project consisted of two different projects notwithstanding that the land which made up both projects was purchased at the same time and subject to one mortgage. Furthermore, even if the Bankruptcy Court had found that Dan Valley's construction lien on Sienna Pointe # 2 did relate back to the date of first physical improvement on Sienna Pointe # 1, summary judgment in favor of RFC was still proper in this case because Dan Valley has failed to present evidence which establishes that the date of first improvement of Sienna Pointe # 1 was before RFC extended the loan mortgage to the Debtor.

Lastly, Dan Valley argues under the Construction Lien, that Dan Valley's lien has priority of RFC's lien to the extent that RFC extended the Debtor funds after Dan Valley began work on Sienna Pointe # 2. Dan Valley, however, has presented no evidence, not here on appeal nor in response to summary judgment, to support this argument. The undisputed evidence on the record states as follows:
Dan Valley is uncertain as to the extent to which RFC's secured claim against the Property and the Sale Proceeds represents loan advances made after improvements commenced on Phases I or II of the Project of the Property. Appellant Brief at 7.

Accordingly, upon review of the entire record, the Bankruptcy Court was proper in granting summary judgment in favor of RFC. Upon review of the findings of the Bankruptcy Court, RFC has carried its evidentiary burden demonstrated its lien priority and Dan Valley has failed to present any evidence to support any of its claims under the Construction Lien Act.

CONCLUSION

In response to summary judgment before the Bankruptcy Court and now here on appeal, Dan Valley has simply rested its allegations and has failed to present evidence in the record which would create an issue of material fact that its construction lien has priority of RFC's mortgage lien under any circumstances. Upon thorough review of the Bankruptcy Court's rulings, this court finds that there are no genuine issues of material facts and also finds that was sufficient evidence is the record such that a reasonable fact finder could find in favor of RFC as to its lien priority over Dan Valley. Accordingly, for all the reasons stated above, the decision of Bankruptcy Court is AFFIRMED.

N.D.Ill.,2002.

In re United Homes of Michigan, Inc.
Not Reported in F.Supp.2d, 2002 WL 126518 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32679957 (Trial Motion, Memorandum and Affidavit) Reply Brief of Appellant Dan Valley Excavating, Inc. (Jan. 10, 2002) Original Image of this Document (PDF)
• 2002 WL 32679952 (Trial Motion, Memorandum and Affidavit) Brief of Appellee Residential Funding Corporation (Jan. 3, 2002) Original Image of this Document (PDF)
• 2001 WL 34668148 (Trial Motion, Memorandum and Affidavit) Brief of Appellant Dan Valley Excavating, Inc. (Dec. 10, 2001) Original Image of this Document (PDF)
• 1:01CV08896 (Docket) (Nov. 19, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT D**

Westlaw.

Slip Copy                                                                                      Page 1
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
(Cite as: Slip Copy)

Briefs and Other Related Documents

In re Enron Corp.S.D.N.Y.,2006.Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

In re: ENRON CORP., et al., Reorganized Debtors.

ENRON CORP., Plaintiff,

v.

SPRINGFIELD ASSOCIATES, L.L.C. and Westpac Banking Corporation, Defendants.

ENRON CORP., Plaintiff,

v.

AVENUE SPECIAL SITUATIONS FUND II, LP, DK Acquisition Partners, LP, RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C. and Rushmore Capital-II, L.L.C., Defendants.

ENRON CORP., Enron North America Corp., National Energy Production Corporation, Enron Power Marketing, Inc., Enron Power & Industrial Construction Company, Nepco Services International, Inc. and Nepco Power Procurement Company, Plaintiffs,

v.

BEAR, STEARNS & CO. INC. and Rushmore Capital-I, L.L.C., Defendants.

ENRON CORP., Enron North America Corp., National Energy Production Corporation, Enron Power Marketing, Inc., Enron Power & Industrial Construction Company, Nepco Services International, Inc. and Nepco Power Procurement Company, Plaintiffs,

v.

BEAR, STEARNS & CO. INC., DK Acquisition Partners, LP, Morgan Stanley Emerging Markets, Inc., Rushmore Capital-II, L.L.C., Strategic Value Master Fund, Ltd. and Man Mac 3 Limited, Defendants.

No. 01-16034, ADV. 05-01025, ADV. 05-01029, ADV. 05-01074, ADV. 05-01105, M-47 (SAS), ADV. 05-010.

Sept. 5, 2006.

Albert Togut, Scott E. Ratner, Richard K. Milin, Togut Segal & Segal LLP, New York, NY, for Enron Corp., et al., debtors-in-possession.

H. Lee Godfrey, Kenneth S. Marks, Mary Kathryn Sammons, Susman Godfrey L.L.P., Houston, TX, for Enron Corp., et al., debtors-in-possession.

Richard L. Wasserman, Venable LLP, Baltimore, MD, for Enron Corp., and Enron North America Corp., debtors-in-possession and plaintiffs.

David Lee Evans, Theodore J. Folkman, Hanify & King, P.C., Boston, MA, for defendants Rushmore Capital-I, L.L.C. Rushmore Capital-II, L.L.C.

Jonathan L. Hochman, Schindler Cohen & Hochman LLP, New York, NY, for defendants Strategic Value Master Fund, Ltd. and Man Mac 3 Limited.

Martin Eisenberg, Anna Karpman, Emmet, Marvin & Martin, LLP, New York, NY, for defendant DK Acquisition Partners, LP.

Stephen M. Sinaiko, Jonathan A. Popolow, Kramer Levin Naftalis & Frankel LLP, New York, NY, for defendant Bear, Stearns & Co. Inc.

David Parker, Edward Grosz, Kleinberg, Kaplan, Wolff & Cohen, P.C ., New York, NY, for defendant Springfield Associates, L.L.C.

Stephen J. Shimshak, Douglas R. Davis, Brad S. Karp, Claudia L. Hammerman, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Intervenors Citibank, N.A.

Hugh McDonald, Allen & Overy LLP, New York, NY, David H. Braff, Michael T. Tomaino, Jr., Jeffrey T. Scott, Sullivan & Cromwell LLP, New York, NY, for Intervenors Barclays Bank PLC and its Affiliates.

Herbert Washer, William J.F. Roll III, Seth M. Kean, Shearman & Sterling LLP, New York, NY, for Intervenors Merrill Lynch & Co., Inc ., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and Merrill Lynch Capital Services, Inc.

Richard W. Clary, Julie A. North, Darin P. McAtee, Cravath, Swaine & Moore LLP, New York, NY, for Intervenors Credit Suisse First Boston LLC and its Affiliates.

John H. Maddock, III, McGuirewoods LLP, New York, NY, Robert Plotkin, Dion W. Hayes, McGuirewoods LLP, Washington, D.C., for Intervenor the Toronto-Dominion Bank.

David S. Elkind, Marc F. Skapof, Ropes & Gray LLP, New York, NY, Matthew M. Burke, Stephen Moeller-Sally, Ropes & Gray LLP, Boston, MA, for FleetBoston Financial Corp., Fleet National Bank, DK Acquisition Partners, L.P., Rushmore Capital-I, L.L.C., Rushmore Capital-II, L.L.C., and RCG Carpathia Master Fund, Ltd.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 Certain defendants and permitted intervenors in the above-captioned coordinated adversary proceedings (the "Adversary Proceedings") request leave to file an interlocutory appeal from two orders of the Bankruptcy Court of the Southern District of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

New York (Gonzalez, J.) denying defendants' motions to dismiss claims for equitable subordination and for disallowance filed by Enron Corporation and certain of its affiliates (collectively, "Enron").[FN1] In these opinions the Bankruptcy Court held that a transferee's claim against a bankrupt's estate can be subordinated or disallowed solely because of its predecessor-in-interest's misconduct or failure to return avoidable transfers even when there is no finding of wrongdoing or receipt of avoidable transfers by the transferee.

> FN1. The published order from which leave to appeal is sought with respect to equitable subordination is *Enron Corp. v. Avenue Special Situations Fund, II, LP (In re Enron Corp.)*, 333 B.R. 205 (Bankr.S.D.N.Y.2005) (the "subordination opinion"). The Bankruptcy Court issued substantially similar unpublished opinions in the three other adversary proceedings that have been coordinated for the purposes of this motion, as explained *infra* in Part I of this Opinion. The published order on claim disallowance is *Enron Corp. v. Avenue Special Situations Fund, II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr.S.D.N.Y.2006) (the "disallowance opinion"). The Bankruptcy Court has not issued similar opinions in the three other adversary proceedings as of today's date, although it has so-ordered a stipulation allowing defendants and permitted intervenors to brief the issue as if similar orders had already been entered in the three other proceedings.

Defendants and permitted intervenors move for leave to appeal on the grounds that both the subordination and disallowance opinions are erroneous as a matter of law and that immediate appeal is warranted because of the uncertainty that these rulings-if left undisturbed-would inject into the market for the sale of postpetition claims. They argue, in the alternative, that if a claim can be subordinated and disallowed based solely on a transferor's acts or omissions, then the Bankruptcy Court erred by not allowing a "safe harbor" defense for claims that are acquired in good faith and for value. They argue that these holdings unfairly make transferees strictly liable for their transferors' conduct.

Enron, in turn, argues that the opinions were correctly decided based on both statutory construction and equitable principles, despite the

absence of any controlling authority. Enron argues that if a transferor can immunize its claims from being subordinated and disallowed by transferring them to a good faith purchaser, this would encourage claim holders who have acted inequitably or who have failed to repay avoidable transfers to "wash" their claims by transferring them. Enron asserts that such an outcome would defeat the very purposes behind equitable subordination and claim disallowance.

Although the parties have separately briefed the subordination and disallowance opinions, both motions for leave to appeal are addressed here together because they both involve the same question-whether a transferee's claim can be subordinated or disallowed solely because of the acts or omissions of its predecessor-in-interest. For the following reasons, defendants and intervenors' motions for leave to appeal are granted.

## I. BACKGROUND

On December 2, 2001 (the "Petition Date"), Enron filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[FN2] As of the Petition Date, Enron was an obligor under various credit agreements (the "Credit Arrangements") with certain participating banks (collectively, the "Transferors" or "Intervenors") whose proofs of claim were authorized by the Bankruptcy Court.[FN3] After the Petition Date, the Transferors, who were the original holders of claims asserted against Enron's estate, directly or indirectly transferred the claims to the defendants (or "Transferees") in this case.[FN4]

> FN2. See *In re Enron,* 333 B.R. at 211.

> FN3. See *id.* at 212.

> FN4. See *id.*

*2 On September 24, 2003, Enron filed an adversary proceeding (the "MegaComplaint Proceeding," Docket No. 03-09266) against ten large bank groups, including all of the Transferors that have been allowed by the Bankruptcy Court to intervene in this motion.[FN5] In that action, Enron alleges that the Transferors received certain preferences and fraudulent conveyances and that they aided and abetted Enron's accounting fraud thereby injuring Enron's creditors. Enron seeks recovery of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allegedly improper transfers to the Transferees and equitable subordination of the banks' claims under the Credit Agreements based on allegations of the Transferors' inequitable conduct. The Bankruptcy Court has not yet adjudicated the allegations in the MegaComplaint Proceeding, which the Transferors "vigorously contest." [FN6]

>  FN5. *See id. See also* Debtors' Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together with Objections and Counterclaims to Creditor Defendants' Claims. Enron filed amended complaints on December 1, 2003, April 30, 2004, June 14, 2004 and January 10, 2005.

>  FN6. Intervenor Banks' Memorandum of Law in Support of Defendants' Motions for Leave to Appeal From the Decision of the Bankruptcy Court Regarding Section 510(c) ("Intervenors' Subordination Mem.") at 4; Intervenor Banks' Memorandum of Law in Support of Defendants' Motions for Leave to Appeal From the Decision of the Bankruptcy Court Regarding Section 502(d) of the Bankruptcy Code ("Intervenors' Disallowance Mem.") at 5.

Enron commenced adversary proceedings in the Bankruptcy Court on January 10, 2005, seeking to subordinate and disallow the claims against Enron's estate, which were held by the Transferors as of the Petition Date and subsequently transferred to and asserted by the defendants in these Adversary Proceedings. [FN7] The complaints filed in these Proceedings each assert two causes of action, one for the disallowance of claims under section 502(d) of the Bankruptcy Code and the other for equitable subordination of claims under section 510(c). [FN8]

>  FN7. *See, e.g.,* Complaint for the Disallowance and Equitable Subordination of Claims Against the Reorganized Debtor Formerly Held by Citigroup, Inc., or its Affiliates, No. 05-01025, dated January 10, 2005 (the "Citigroup Proceedings"). Enron filed similarly styled complaints (collectively, the "Adversary Complaint") against: claims formerly held by Fleet National Bank or its affiliates on January 12, 2005, No. 05-01029 (the "Fleet

Proceeding"); claims formerly held by Credit Suisse First Boston or its affiliates on January 19, 2005, No. 05-01074 (the "CFSB Proceeding"); and claims formerly held by Barclays Bank or its affiliates on February 2, 2005, No. 05-01105 (the "Barclays Proceeding").

>  FN8. *See* Adversary Complaint ¶¶ 50-61.

Enron asserts that if the claims still belonged to the Transferors, they would have been subject to disallowance under section 502(d) and subordination under section 510(c). [FN9] Enron then argues that the transferred claims should be subordinated and disallowed to the same extent as if the Transferors still held them even though there is no allegation that any of the Transferees did anything improper, nor that they received any avoidable transfers. [FN10] Therefore, the sole basis for Enron's section 502(d) and section 510(c) allegations is the alleged acts and omissions of defendants' predecessors-in-interest coupled with the argument that the transference of such claims should have no impact on the applicability of disallowance or subordination.

>  FN9. *See id.* ¶¶ 52-53, 58.

>  FN10. *See id.* ¶¶ 54, 59.

After defendants moved to dismiss these adversary proceedings, the Bankruptcy Court entered an order on April 27, 2005 to coordinate briefing on the following issues: whether a claim asserted by a transferee is subject to subordination under section 510(c) or disallowance under section 502(d) solely because the transferor is found to have engaged in conduct that would warrant equitable subordination or disallowance if the claims were still held by the transferor. [FN11] This order also allowed the Intervenor Banks, who are named defendants in the MegaComplaint Proceeding, to intervene for the purposes of briefing and arguing these issues. [FN12] The Transferors have been and remain interested in these adversary proceedings because they may ultimately be liable for the claims they transferred. That is, if such claims are found to be subject to subordination and disallowance and therefore lose monetary value, then the Transferees are likely to seek indemnity from their Transferors. [FN13]

>  FN11. *See* 4/27/05 Coordinated Scheduling and Intervention Order ¶ 2 ("[W]hether a

Slip Copy                                                                    Page 4
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

claim asserted by a transferee that acquired its claim on or after [the Petition Date] directly or indirectly, from a defendant in the MegaComplaint Proceeding (each, a 'MegaDefendant') that is alleged to have held such claim on the Petition Date, is subject to (a) subordination under section 510(c) of the Bankruptcy Code solely because such MegaDefendant transferor is found to have engaged in wrongful or inequitable conduct that would warrant equitable subordination of such claim in the hands of such MegaDefendant transferor, or (b) disallowance under section 502(d) of the Bankruptcy Code to the extent that a MegaDefendant transferor(s) that held the claim on or after the Petition Date is found to be an entity from which property is recoverable, or a transferee of avoidance transfers, under section 502(d) of the Bankruptcy Code.").

FN12. *See id.*

FN13. At least one of the Transferees has already brought suit against its Transferor, referencing the suit that Enron has brought against it in the Adversary Complaint and seeking damages for breach of warranty based, in part, on an indemnity clause in the contract. *See* 8/4/05 Complaint in *Westpac Banking Corp. v. Citibank, N.A .,* No. 05 Civ 6939(MBM). This case has been transferred by the Judicial Panel on Multidistrict Litigation to the Southern District of Texas. *See* 2/15/06 Transfer Order.

**\*3** On November 17, 2005, the Bankruptcy Court denied the motion to dismiss with respect to Enron's equitable subordination claim in the Fleet Proceeding. [FN14] The Bankruptcy Court made two rulings of first impression in the Second Circuit. *First,* the court held that "a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief, as if, [sic] such claim were still held by the transferor." [FN15] *Second,* the court held that "the policy underlying the 'good faith' defense in various provisions of the Bankruptcy Code does not warrant the extension of such defense to purchasers of claims." [FN16] The court also concluded that even if such a good faith defense was available, it could not be invoked by the defendants because as purchasers of post-petition

bankruptcy claims, the transferees were on notice of the risk that such claims could be subordinated.[FN17]

FN14. *See supra* note 1. On November 28, 2005, the Bankruptcy Court issued opinions in the Citigroup, CSFB and Barclays Proceedings that are substantially identical to the November 17 equitable subordination ruling in the Fleet Proceeding. On December 20 and 23, 2005, the Bankruptcy Court entered orders implementing its equitable subordination rulings in the various adversary proceedings. On December 23, 2005, the Bankruptcy Court entered an order coordinating the Fleet, Citigroup, CSFB and Barclays Proceedings for purposes of briefing the motion for leave to appeal the orders denying the motions to dismiss the claims for equitable subordination. That order also permitted the Transferors to brief the issue and they have filed the principal memorandum in support of the motions for leave to appeal the subordination ruling.

FN15. *In re Enron,* 333 B.R. at 210.

FN16. *Id.* at 211.

FN17. *See id.* The defendants who have moved for leave to appeal the subordination ruling have either joined in the Intervenors' brief without filing their own brief, or have filed a brief in their own name that is substantially identical to the Intervenors' brief. The parties and motions before the Court on the subordination ruling are: (1) Springfield Associates LLC, one of two defendants in the Citigroup Proceeding, has filed a memorandum substantially identical to that filed by the Intervenor Banks; (2) Bear Stearns & Co., Inc. ("Bear"), one of two defendants in the CSFB Proceeding, has moved for leave to appeal relying solely on the Intervenor Banks' brief; (3) Bear, DK Acquisition Partners ("DK"), Strategic Value Master Fund, Ltd. and Man Mac 3 Limited, four of the six defendants in the Barclays Proceeding, have moved for leave to appeal based on their memorandum of law joining in the Intervenors' arguments; (4) DK, RCG Carpathia Master Fund, Ltd. ("RCG"), Rushmore Capital-I, L.L.C. (Rushmore I) and Rushmore Capital-II, L.L.C. (Rushmore II), four of the five

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

defendants in the Fleet Proceeding, have filed a memorandum for leave to appeal that is substantially identical to the Intervenors' brief.

On March 31, 2006, the Bankruptcy Court denied the motions to dismiss with respect to Enron's claim for disallowance in the Fleet Proceeding. The central holding of that ruling is: "Once it is established that a claim in the hands of the transferor would be subject to disallowance, such claim in the hands of a transferee should ... be disallowed to the same extent that such claim would be subject to disallowance in the hand of a transferor." [FN18] As in its subordination ruling, the Bankruptcy Court held as a matter of law that Transferees cannot assert a good faith defense against claims for disallowance, but even if they could, the defense would fail because Transferees had notice of the risk that the claims they purchased might be disallowed. [FN19] On April 28, 2006, the Bankruptcy Court entered an order implementing its disallowance ruling in the Fleet Proceeding. [FN20]

> FN18. *In re Enron,* 340 B.R. at 199. This issue has been addressed by only two other district courts which reached opposite conclusions. *See In re Metiom, Inc.,* 301 B.R. 634 (Bankr.S.D.N.Y.2003) (holding that disallowance under section 502(d) applies to the claim and not the claimant) *and Section 1102(A)(1) Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.),* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D.Tex. June 20, 1988) (holding that disallowance only applies to a claimant).

> FN19. *Id.* at 205-08.

> FN20. Because the disallowance ruling was only entered in the Fleet Proceeding, no defendant from any other proceeding has submitted a brief requesting leave to appeal. In the Fleet Proceeding, DK, RCG, Rushmore I and Rushmore II have submitted a memorandum of law that is substantially identical to the Intervenors' brief. The Transferors once again filed the principal memorandum for leave to appeal the disallowance ruling. Therefore, the Court will only cite to and address the arguments raised in the Intervenors' memoranda on both motions.

## II. LEGAL STANDARD

### A. Interlocutory Orders Under Section 158(a)(3)

Appeals from non-final bankruptcy court orders may be taken pursuant to section 158(a)(3) of title 28 of the United States Code. [FN21] In deciding whether to grant leave to appeal, reviewing courts apply the standards of section 1292(b) of title 28 of the United States Code, which governs the appealability of interlocutory district court orders. [FN22] In order to permit an interlocutory appeal pursuant to section 1292(b), the order being appealed must "(1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion," and the movant must also show that "(3) an immediate appeal would materially advance the ultimate termination of the litigation." [FN23] This standard is strictly applied as interlocutory appeals from bankruptcy courts' decisions are "disfavored" in the Second Circuit. [FN24]

> FN21. *See also* 28 U.S.C. § 158(c)(2) ("An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.").

> FN22. *See In re Adelphia Commc'ns Corp.,* No. 03 Civ. 8848, 2006 WL 1114054, at *3 (S.D.N.Y. Apr. 26, 2006).

> FN23. 28 U.S.C. § 1292(b).

> FN24. *In re Enron Corp.,* Nos. M-41, 01-16034, 03-93371, 03-93388, 03-93373, 2006 WL 1222035, at *1 (S.D.N.Y. May 3, 2006).

In addition, leave to appeal is warranted only when the movant demonstrates the existence of "exceptional circumstances" [FN25] to overcome the "general aversion to piecemeal litigation" [FN26] and to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." [FN27] Interlocutory appeal "is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation,' ... and is not intended as a vehicle to provide early review of difficult rulings in hard cases." [FN28] The decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion. [FN29]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 6
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

FN25. *Williston v. Eggleston,* 410 F.Supp.2d 274, 276 (S.D.N.Y.2006).

FN26. *In re AroChem Corp.,* 176 F.3d 610, 619 (2d Cir.1999). *Accord Ted Lapidus, S.A. v. Vann,* 112 F.3d 91, 95 (2d Cir.1997).

FN27. *Flor v. Bot Fin. Corp. (In re Flor),* 79 F.3d 281, 284 (2d Cir.1996) (quotation marks and citations omitted).

FN28. *Liebert v. Levine (In re Levine* ), No. 94-44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004) (quoting *German v. Federal Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1398 (S.D.N.Y.1995)).

FN29. *See, e.g., In re Kassover,* 343 F.3d 91, 94 (2d Cir.2003); *DM Rothman Co., Inc. v. Cohen Marketing Int'l, Inc.,* No. 98 Civ. 7905, 2006 WL 2128064, at *1 (S.D.N.Y. July 27, 2006).

*4 "In regard to the first prong, the 'question of law' must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record." [FN30] The question must also be "controlling" in the sense that reversal of the bankruptcy court's order would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome.[FN31]

FN30. *In re Worldcom,* No. M-47, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

FN31. *See In re XO Commc'ns, Inc.,* Nos. 02-12947, 03 Civ. 1898, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004); *North Fork Bank v. Abelson,* 207 B.R. 382, 389-90 (E.D.N.Y.1997).

As to the second prong, the "substantial ground for a difference of opinion" must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard.[FN32] The requirement that such a substantial ground exists may be met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." [FN33] However, it is not sufficient that the relevant case law is "less than clear" or allegedly "not in accord" [FN34] or that there is

a "strong disagreement among the parties." [FN35] The mere presence of a disputed issue that is a question of first impression, without more, is insufficient to satisfy this prerequisite.[FN36] The district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is *substantial* ground for dispute." [FN37] Finally, in regard to the third prong, " '[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial ." ' [FN38] Courts place particular emphasis on the importance of this last factor.[FN39]

FN32. *See In re Worldcom,* 2003 WL 21498904, at *10 (citation omitted).

FN33. *In re Lloyd's Am. Trust Funds Litig.,* No. 96 Civ. 1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (citing *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir.1990)).

FN34. *North Fork Bank,* 207 B.R. at 390 (holding that disagreement between parties about meaning of the term "business trust" did not rise to a level of a "substantial ground for a difference of opinion," because definition of term was not a matter of first impression in the Circuit).

FN35. *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC* ), Nos. 99-45005, 01-02952, M-47, 2003 WL 21507196, at *1 (S.D.N.Y. June 30, 2003) (stating that to demonstrate that there is a substantial ground for difference of opinion a party "must show that the issue is difficult and of first impression and involves more than just a strong disagreement among the parties") (quotation omitted).

FN36. *See In re Flor,* 79 F.3d at 284. The Bankruptcy Court notes in both rulings that there is no controlling precedent. *See In re Enron,* 333 B.R. at 216 ("Enron asserts that its position is based on equitable principles, not on the holding of any particular case cited by it."); *id. at 224* (stating that in determining whether equitable subordination applies, "no case has limited such consideration in the context of a transferred

Slip Copy                                                                    Page 7
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

claim to only the conduct of the current holder"); *In re Enron,* 340 B.R. at 195-96 ("The Court has not found any case law mandating that the creditor who received an avoidable transfer be the same entity that actually asserts such claim against the debtor in the bankruptcy proceeding in order for a debtor to assert a section 502(d) disallowance against such a claim.").

FN37. *In re Flor,* 79 F.3d at 284 (quotation omitted). *Accord Marlin v. U.S. Trustee,* 333 B.R. 14, 20 (W.D.N.Y.2005).

FN38. *Transportation Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.,* 358 F.Supp.2d 347, 350 (S.D.N.Y.2005) (quoting *In re Oxford Health Plans, Inc.,* 182 F.R.D. 51, 53 (S.D.N.Y.1998)).

FN39. *See Koehler v. Bank of Bermuda, Ltd.,* 101 F.3d 863, 865-66 (2d Cir.1996) ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."); *Lerner v. Millenco, L.P.,* 23 F.Supp.2d 345, 347 (S.D.N.Y.1998) ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal.").

B. Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure is incorporated into bankruptcy procedure by Rule 7012(b) of the Bankruptcy Rules. A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' " [FN40] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[FN41] "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." [FN42] Even though the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[FN43]

FN40. *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005) (quoting

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

FN41. *See Kirch v. Liberty Media Corp.,* 449 F.3d 388, 392 (2d Cir.2006) (citation omitted).

FN42. *Law Offices of Curtis V. Trinko, L.L.P., v. Bell Atl. Corp.,* 309 F.3d 71, 74 (2d Cir.2002) (quotation omitted).

FN43. *See Allaire Corp. v. Okumus,* 433 F.3d 248, 250 (2d Cir.2006).

III. DISCUSSION

This is one of the rare cases in which an immediate review of an interlocutory order is warranted. The three prongs of section 1292(b) are met here and exceptional circumstances exist. The Bankruptcy Court's two rulings-that equitable subordination and disallowance travel with the claim and that there is no good faith defense-mean that if the Transferors' claims are found to be subject to equitable subordination and disallowance in the MegaComplaint Proceeding, then these findings will automatically subordinate and/or disallow defendants' claims. Enron correctly argues that the denials of the motions to dismiss may never need to be reviewed if the MegaComplaint defendants are not found liable of misconduct or of having received avoidable transfers or if there are settlements in either the MegaComplaint or Adversary Proceedings that end the actions against the defendants.[FN44] But it is precisely the risk that these orders will go unreviewed that makes this an exceptional case.

FN44. *See* Enron's Memorandum of Law in Opposition to Defendants' Motions for Leave to Appeal From the Bankruptcy Court's Decisions Concerning Equitable Subordination of Claims ("Enron's Subordination Mem.") at 10-11 (citing *U.S. Trustee v. Bethlehem Steel Corp.* (*In re Bethlehem Steel Corp.*), No. 02 Civ. 2854, 2003 WL 21738964, at *4 (S.D.N.Y. July 28, 2003) ("[d]eciding an issue now, which may never need to be decided, does not help to advance the litigation")); Declaration of Richard K. Milin, plaintiff's counsel, in support of Enron's Memorandum of Law in Opposition to Defendants' Motion for Leave to Appeal From the Bankruptcy Court's Ruling Concerning Temporary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 8
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
(Cite as: Slip Copy)

Disallowance of Transferred Claims under 11 U.S.C. § 502(d) ("Enron's Disallowance Mem.") at ¶ 2 (referring to settlements in the MegaComplaint proceeding).

**\*5** With respect to the first prong of section 1292(b), the orders being appealed involve pure questions of law and there is no need to make any factual determinations in order to decide whether the rulings are correct. Assuming that the allegations against the Transferors are true-and there are no allegations of impropriety against the transferee-defendants-the question is whether Enron can prevail, as a matter of law, on its equitable subordination and disallowance claims against the defendants.[FN45] If the answer is yes, then the next question is whether defendants are permitted to assert the defense of being good faith purchasers. Neither of these issues require any factual determination. Finally, the orders involve a controlling question of law. If the Bankruptcy Court's rulings denying the dismissal of Enron's two causes of action in the Adversary Proceeding are reversed, this may result in the dismissal of these actions in their entirety.

> FN45. *See In re Enron,* 333 B.R. at 215 ("Thus for purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint. Further, for purposes of this motion, the Defendants do not dispute any of the factual allegations regarding the [Transferor]. The focus of the Defendant's [sic] motion is that, even if such allegations were true, the cause of action for equitable subordination fails as a matter of law.").

The second prong requires the Court to analyze the strength of the Intervenors' arguments to determine if there is a "substantial ground for difference of opinion." [FN46] The Intervenors argue that the Bankruptcy Court erred in its subordination opinion by ignoring well-established "principles of equitable subordination" found in the language of section 510(c) and its legislative history, and instead inappropriately relied on analogies to the law of assignments and the assignment of priority wage claims. [FN47] The Bankruptcy Court drew these analogies to support its conclusion that a transferee could enjoy no greater rights than the transferor.[FN48] "On the contrary, case law has affirmed the principle that under a bankruptcy proceeding, '[a]n assignee stands in the shoes of the assignor and subject to all equities against the assignor.' " [FN49] The Bankruptcy

Court also referenced two cases holding that the assignment of a claim for wages cannot change the statutory priority of that claim; rather, the claim for wages has the same priority when held by the assignee as it would have had were it still held by the wage earner.[FN50]

> FN46. 28 U.S.C. § 1292(b).

> FN47. *See* Intervenors' Subordination Mem. at 9-16.

> FN48. *See In re Enron,* 333 B.R. at 223.

> FN49. *Id.* (quoting *Goldie v. Cox,* 130 F.2d 695, 720 (8th Cir.1942) (citing *Fidelity Mut. Life Ins. Co. v. Clark,* 203 U.S. 64, 74 (1906))).

> FN50. *See id.* at 223-24 (citing *Shropshire, Woodliff & Co. v. Bush et al.,* 204 U.S. 186, 189 (1907) and *Wilson v. Brooks Supermarket, Inc.* (*In re Missionary Baptist Found. of Am.*), 667 F.2d 1244, 1247 (5th Cir.1982)).

The Intervenors further argue that the analogy to the law of assignments is misguided because the Bankruptcy Court assumed the truth of its conclusion. [FN51] If equitable subordination is required no matter who owns the claim, then the analogy to assignment law logically follows. But if the correct interpretation of section 510(c) is that equitable subordination can only apply to a claimant because of its own wrongdoing, then the law of assignments is simply not relevant.[FN52]

> FN51. *See* Intervenors' Subordination Mem. at 14-16.

> FN52. *See id.*

The Intervenors also argue that the Bankruptcy Court erred in interpreting section 510(c) by selectively focusing on one part of the statute and ignoring the rest.[FN53] Section 510(c) states: "[A]fter notice and a hearing, the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another claim...." The Bankruptcy Court focused on the fact that section 510(c) mentions "claims" instead of "claimants" which the Court interpreted to mean that Congress did not intend to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

limit the section's application to the claimant at the time that the claim was asserted.[FN54] By contrast, the Intervenors point to the importance of the phrase "principles of equitable subordination" which they claim that the Bankruptcy Court failed to consider.[FN55]

FN53. *See id.* at 9-10.

FN54. *See id.* at 9-14. See also *In re Enron,* 333 B.R. at 225.

FN55. *See* Intervenors' Mem. at 9-10.

*6 The Intervenors provide a substantial and facially persuasive argument that the language of section 510(c) and its legislative history, as well as case law, indicate that the "principles of equitable subordination" do not allow the doctrine to be applied to innocent claim holders.[FN56] Without deciding the merits of this argument, I note that in its leading opinion on equitable subordination, the Supreme Court stated that it "need not decide today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." [FN57] But the Court did state that "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." [FN58]

FN56. Because the Supreme Court has already explained that legislative history is useful in interpreting the meaning of the phrase the "principles of equitable subordination" in the context of section 510(c), the Court need not examine whether other avenues of interpretation have been exhausted before considering the legislative history. *See United States v. Nolan,* 517 U.S. 535, 543 (1996). *See also United States v. Boccagna,* 450 F.3d 107, 114 (2d Cir.2006) ("Only if we conclude that statutory language is ambiguous 'do we resort ... to canons of construction and, if the meaning [still] remains ambiguous, to legislative history.' ") (quoting *Daniel v. American Bd. of Emergency Med.,* 428 F.3d 408, 423 (2d Cir.2005)).

FN57. *Nolan,* 517 U.S. at 543.

FN58. *Id.*

The important question raised by the Intervenors is whether the Bankruptcy Court, in holding that equitable subordination may be applied to an innocent claim holder, impermissibly operated at "the level of policy choice" which is reserved for Congress. Intervenors make the same argument with respect to the Bankruptcy Court's holding that an innocent transferee cannot assert a good faith defense to a claim of equitable subordination. Intervenors argue that this holding contradicts the Congressional policy choice, revealed in various sections of the Bankruptcy Code, that protects the claims of innocent transferees.[FN59]

FN59. *See* Intervenors' Subordination Mem. at 16-18; *see also* Intervenors' Disallowance Mem. at 17-18.

Enron argues that the Bankruptcy Court's holding that transferring a claim cannot immunize it from subordination is correct "as a matter of precedent, policy, equity and common sense." [FN60] To reverse this holding would authorize creditors to "wash" their claims through transfer, thereby eliminating the remedy of equitable subordination, which no court decision has ever endorsed.[FN61] Enron maintains that the Intervenors' argument that an innocent transferee's claims can never be subordinated is erroneous.[FN62] As noted earlier, the Supreme Court in *Nolan* left open the question of whether there must always be creditor misconduct before a claim may be subordinated. After *Nolan,* two appellate courts have held that in certain circumstances, such as stock redemption claims and prepetition tax penalties, creditor misconduct is not a prerequisite for the application of disallowance .[FN63]

FN60. Enron's Subordination Mem. at 5.

FN61. *See id.* at 26-28.

FN62. *See id.* at 32-35.

FN63. *See id.* at 33 (citing *SPC Plastics Corp. v. Griffith (In re Structurelite Plastics Corp.),* 224 B.R. 27, 35 (6th Cir.B.A.P.1998) and *In re Lifshultz Fast Freight,* 132 F.3d 339, 348 (7th Cir.1997)).

Enron next argues that purchasers of postpetition claims are well aware of the risk that the claims they purchase may be subordinated, and protect

Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

themselves from this risk by obtaining contractual indemnities which are not available to those creditors whose claims arose prepetition. Relying on such indemnities (or other contractual rights), some Transferees in these proceedings have sued their Transferors for transferring tainted claims.[FN64] Enron argues that this explains why the Transferors have taken the lead in litigating this motion: "the Transferors are asking this Court to make an immediate ruling that Enron must pay 'innocent' claim assignees so that the Transferors-despite the inequitable conduct alleged in [MegaComplaint Proceeding]-do not have to. Nothing could be more inequitable."[FN65] Enron asserts that the subordination ruling correctly held that as a practical matter, it would be unduly burdensome to require bankruptcy estates to make distributions to all innocent claimants and then bring an action against transferors for recompense. Finally, Enron argues that the Congressional policy of protecting innocent transferees is best served by protecting Enron's prepetition creditors who have acted in good faith and by not requiring them to share their recoveries from the estate with creditors, or their transferees, who "acted inequitably to the innocent creditors' detriment."[FN66]

FN64. *See id.* at 36.

FN65. *Id.* at 27-28.

FN66. *Id.* at 41.

*7 This summary of the various arguments reveals a substantial ground for a difference of opinion on a difficult issue of first impression in this circuit. Thus, the requirements of the second prong are met with respect to the issues raised on the appeal of the subordination ruling.

The same is true of the disallowance ruling. The Intervenors argue that the Bankruptcy Court ignored both the plain language of, and the purpose behind, section 502(d), relying instead on its own policy preferences.[FN67] Section 502(d) states:

FN67. *See* Intervenors' Disallowance Mem. at 1-3.

[T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(I), 542, 543, 550, or 553 of this title.
The Bankruptcy Court interpreted this statute to mean that disallowance applies to a claim without reference to its holder: "This statutory reference is to *any claim.* There is no requirement that a claim subject to a section 502(d) disallowance be related to an avoidable transfer."[FN68]

FN68. *In re Enron,* 340 B.R. at 194.

The Intervenors argue that the Bankruptcy Court erroneously isolated the words "any claim" from the rest of section 502(d) and that the correct statutory reference is to "any claim of any entity that is a transferee of a transfer avoidable" under the Bankruptcy Code.[FN69] The statutory language does not focus on "any claim" but rather on *"any entity"* that has received an avoidable transfer. Because there are no allegations that the defendants have received any avoidable transfers, their claims cannot be disallowed by the first clause of section 502(d). This reading is further supported by the final clause of section 502(d) ("unless such entity ....") which explains that disallowance cannot be applied when the entity has "turned over" any transfer for which it is liable. The Intervenors argue that this last clause again shows that the focus of section 502(d) is on the entity and not the claim, because only the entity that has received the avoidable transfer is capable of turning it over so as to prevent the claims from being disallowed.[FN70]

FN69. *See* Intervenors' Disallowance Mem. at 10 (quoting § 510(d)).

FN70. *See id.* at 11.

The legislative history of section 502(d), as well as the case law, indicate that its purpose is to promote a fair distribution of the estate's assets by disallowing a creditor from asserting a claim until he pays the estate what he owes.[FN71] The Intervenors argue that this purpose is not implicated here because the Transferors who allegedly received avoidable transfers are not asserting claims against the estate while the Transferees who are asserting claims are not alleged to have improperly received transfers.[FN72] The Bankruptcy Court found that the coercive purpose of section 502(d) in forcing debts to be

Slip Copy                                                                                   Page 11
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

repaid could be effectively met by disallowing defendants' claims, thereby forcing them to seek indemnity from the Transferors.[FN73] The Transferors argue that this indirect attempt at coercion will not be effective when transferees lack indemnity agreements and that it contravenes the Congressional policy choice of protecting good faith purchasers.[FN74] Finally, the Intervenors claim that the Bankruptcy Court erroneously relied on policy justifications in holding that claims can be disallowed regardless of who holds them.[FN75]

> FN71. *See id.* at 14-16 (citing, *inter alia, Campbell v. United States (In re Davis ),* 889 F.2d 658, 662-63 (5th Cir.1989); *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs., Inc.*), 322 B.R. 440, 452 (N.D.Okla.2003)).

> FN72. *See id.* at 15.

> FN73. *See In re Enron,* 340 B.R. 202-03.

> FN74. *See* Intervenors' Disallowance Mem. at 17.

> FN75. *See In re Enron,* 340 B.R. at 205 ("When one balances the harm to the other members of the injured-creditor class as against the risks to a claim-purchaser who voluntarily becomes a participant in the bankruptcy process, the interests of the other members of the injured-creditor class prevail.").

**\*8** Enron, by contrast, argues that the Bankruptcy Court correctly applied the disallowance provision of section 502(d) by refusing to allow creditors to immunize their claims by transferring them.[FN76] Enron argues that bankruptcy law has consistently found that transferees cannot stand in any better position than their assignor.[FN77] For example, a creditor's rights are generally determined by reference to the petition date, such that postpetition transferors are unable to alter a claim's characteristics. [FN78] Enron disputes Transferors' assertion that no case before *Metiom* disallowed a transferred claim, noting that while "the Transferors may have found no *published opinion* directly on point, [ ] that may mean only that no one *disputed* that transferred claims could be disallowed." [FN79] Finally, Enron argues that transferees can protect themselves from the risk that their claims will be disallowed through contractual provisions. But if

transferred claims are not subject to disallowance, then bankruptcy estates are unprotected as they cannot prevent disreputable creditors from transferring their claims. [FN80] For these reasons, the disallowance motion meets the requirements of the second prong of section 1292(b) because the issues for appeal raise substantial grounds for dispute.

> FN76. *See* Enron's Disallowance Mem. at 2-3; *see id.* at 15-16. *See also In re Metiom,* 301 B.R. at 643 (holding that allowing an assignment to immunize a claim would be a "pernicious result").

> FN77. *See* Enron's Disallowance Mem. at 19-20.

> FN78. *See id.* at 20.

> FN79. *Id.* at 19.

> FN80. *See id.* at 20-21.

The third prong is easily met, because granting leave to appeal both the subordination and disallowance opinions may result in the disposition of the Adversary Proceedings in their entirety. In its Adversary Complaint, Enron alleged only two causes of action, one for subordination and one for disallowance. The Bankruptcy Court ruled that both causes of action are viable. If both of these opinions are reversed, Enron's case may be dismissed.

### V. CONCLUSION

For the foregoing reasons, the defendants and Intervenors' motions for leave to appeal are granted. The parties are to agree on and submit an expedited briefing schedule no later than September 12, 2006.
SO ORDERED:

S.D.N.Y.,2006.
In re Enron Corp.
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3038836 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lehman's Motion for Leave to Appeal from the Decision of the Bankruptcy Court (Aug. 1, 2005)
• 2005 WL 4124976 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2548592 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Page 12

and Affidavit) Enron's Memorandum of Law in Opposition to the Motion of Certain Trade Associations for Leave to File Brief of Amici Curiae in Support of Defendants' Motion for Leave to Bring Interlocutory Appeal (Feb. 28, 2005)

• 2002 WL 32155462 (Trial Filing) Opposition of Mission Iowa Wind Company and Storm Lake Power Partners I LLC to Application Seeking to Approve the Debtors' Proposed ""Allocation Formulation" or Otherwise Seeking to Allocate Any ""Shared Expenses" to Any of the Enron Wind Debtors (Oct. 28, 2002)

• 2002 WL 33966522 () (Transcript) (Apr. 30, 2002)
Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

Westlaw.

Not Reported in F.Supp.                                                                                                            Page 1
Not Reported in F.Supp., 1992 WL 96333 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

In re GroupHealth Partnership, Inc.E.D.Pa.,1992.Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
In re GROUPHEALTH PARTNERSHIP, INC., Debtor.
**Misc. No. 92-0124.**

April 21, 1992.

Douglas N. Candeub, Adelman, Lavine, Gold & Levin, Philadelphia, Pa., for debtor.
Michael T. Scott, Reed, Smith, Shaw & Mc Clay, Philadelphia, Pa., for Hahnemann University.

*MEMORANDUM/ORDER*
LOUIS H. POLLAK, Senior District Judge.
**\*1** This action comes before this court on the motion of Hahnemann University ("Hahnemann") for leave to appeal an interlocutory order of the Bankruptcy Court. Debtor GroupHealth Partnership, Inc. ("GroupHealth"), a health maintenance organization ("HMO") organized under the laws of Pennsylvania, voluntarily petitioned for protection under Chapter 11 of the bankruptcy code. Hahnemann, a creditor of GroupHealth, moved to dismiss the petition on the grounds that GroupHealth was a "domestic insurance company" within the meaning of section 109(b)(2) of the bankruptcy code and therefore could not be a debtor under Chapter 11.[FN1] Hahnemann acknowledged that for most purposes HMOs are not subject to the laws governing insurance companies in Pennsylvania. *See* 40 P.S. § 1560(a). It pointed, however, to 40 P.S. § 1560(b), which provides as follows:

All health maintenance organizations shall be subject to the following insurance laws:

(b) Any rehabilitation, liquidation or conservation of a health maintenance organization shall be deemed to be the rehabilitation, liquidation or conservation of an insurance company and shall be conducted under the supervision of the commissioner pursuant to the law governing the rehabilitation, liquidation or conservation of insurance companies.

Hahnemann reads section 1560(b), together with

section 109(b)(2) of the bankruptcy code, to mean that for liquidation purposes GroupHealth is an insurance company and therefore does not qualify as a debtor under the bankruptcy code.

The Bankruptcy Court, in an opinion and order dated March 4, 1992, denied Hahnemann's motion to dismiss, concluding that section 1560(b) did not affirmatively remove HMOs from the coverage of the bankruptcy code but rather gave the Insurance Department of the Commonwealth of Pennsylvania the option to oversee the liquidation of HMOs on a case-by-case basis. Because the Insurance Department had expressed a desire to defer to the Bankruptcy Court in the present case, the court concluded that it had jurisdiction over GroupHealth's petition.

Hahnemann now seeks review of that conclusion. It concedes that the denial of its motion to dismiss was an interlocutory order. Review of interlocutory orders of the bankruptcy court is available in the district court pursuant to 28 U.S.C. § 158(a), which provides in relevant part:

The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

Section 158(a) provides little guidance to a district court concerning the circumstances under which interlocutory appeal is appropriate. In the absence of such guidance from section 158(a) itself, courts in this district and others have turned to 28 U.S.C. § 1292(b), which governs interlocutory appeals from the district court to the court of appeals.[FN2] *See In re Neshaminy Office Bldg. Assocs.,* 81 B.R. 301, 302 (E.D.Pa.1987); *In re Bertoli,* 58 B.R. 992, 995 (D.N.J.1986); *In re Moskowitz,* 14 B.R. 307, 308 (S.D.N.Y.1981). That section, as modified by the courts to apply to interlocutory appeals from the bankruptcy court, states that a district court may accept an interlocutory appeal when it is satisfied that (1) a controlling question of law is involved; (2) the question is one where there is substantial ground for difference of opinion; and (3) an immediate appeal would materially advance the ultimate termination of the litigation. *See In re Neshaminy,* 81 B.R. at 303.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1992 WL 96333 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**\*2** In the present case, the question of whether an HMO is an insurance company for the purposes of the bankruptcy code is a purely legal question that controls whether the Bankruptcy Court has jurisdiction over GroupHealth's petition. Moreover, the question appears to be one where there is substantial ground for difference of opinion. Hahnemann points to two cases in which courts concluded that HMOs were domestic insurance companies for the purposes of the bankruptcy code. *See* In re Beacon Health, Inc., 105 B.R. 178 (Bankr.D.N.H.1989); *In re Portland Metro Health, Inc.,* 12 B.R. 102 (Bankr.D.Ore.1981). The Bankruptcy Court distinguished those two cases by noting that in each case the party seeking dismissal for lack of jurisdiction was not a creditor but rather the insurance department of the relevant state. That distinction may well be a viable one. Nevertheless, at least facially, there is a split among courts in different circuits. I therefore conclude that, for the purposes of the present motion, Hahnemann has shown that substantial grounds for difference of opinion exist.

Finally, the issue that Hahnemann seeks to have addressed on interlocutory appeal is clearly one that, if decided in Hahnemann's favor, would materially advance the ultimate termination of the litigation by depriving the Bankruptcy Court of jurisdiction over GroupHealth's petition.

For these reasons, interlocutory appeal in the present case is appropriate. It is therefore ORDERED and DIRECTED that Hahnemann's motion for leave to appeal is GRANTED.

FN1. Section 109(b) states in relevant part: "A person may be a debtor under chapter 7 of this title only if such person is not- ... (2) a domestic insurance company...." 11 U.S.C. § 109(b). Section 109(d) further provides: "Only a person that may be a debtor under chapter 7 of this title, except a stockbroker or a commodity broker, and a railroad may be a debtor under chapter 11 of this title." 11 U.S.C. § 109(d).

FN2. Section 1292(b) provides in relevant part:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is

substantial grounds for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order....

E.D.Pa.,1992.
In re GroupHealth Partnership, Inc.
Not Reported in F.Supp., 1992 WL 96333 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 535316 (S.D.Ind.), 89 A.F.T.R.2d 2002-1619
**(Cite as: Not Reported in F.Supp.2d)**

In re BeattyS.D.Ind.,2002.
United States District Court, S.D. Indiana,
Indianapolis Division.
In re: Charles BEATTY and Peggy Beatty, Debtors.
Charles BEATTY and Peggy Beatty, Plaintiffs,
v.
UNITED STATES OF AMERICA, Defendant.
**No. IP 01-1582-C-T/K.**

Feb. 27, 2002.


ENTRY ON DEFENDANT'S MOTION FOR
LEAVE TO APPEAL
TINDER, J.
*1 Defendant filed this motion for leave to appeal the
Bankruptcy Court's denial of its Motion to Dismiss.
Plaintiffs oppose the motion. This court now
GRANTS Defendant's Motion.


I. Factual and Procedural Background

On September 28, 1995, the Plaintiffs filed a Chapter
13 bankruptcy proceeding. On October 30, 1996, the
United States filed a proof of claim for
unemployment tax liability and both the trust fund
and non-trust fund portions of corporate employment
tax. The Plaintiffs filed no objection to this claim and
their proposed plan of reorganization provided for
payment of those liabilities. On January 6, 1997, the
Chapter 13 plan was approved. Although the
Plaintiffs made payments on the plan for a time,
eventually, the payments stopped and, on July 26,
2000, the bankruptcy was converted to a Chapter 7.
At this time, the Plaintiffs had not fully satisfied their
recent federal tax liabilities.

On October 17, 2000, the Plaintiffs filed a motion for
redetermination of tax claim that was converted into
an adversary proceeding. Plaintiffs claim that the
non-trust fund portion of the federal employment tax
liability as well as the unemployment tax liability
should not have been included in the claim against
them. They seek a refund of over fifteen thousand
dollars. The trustee filed a motion to intervene.
Defendant then moved to dismiss the complaint and
objected to the trustee's motion to intervene. The
bankruptcy court denied Defendant's motions.
Defendant then filed this motion to which Plaintiffs
object. The court now rules as follows.

II. Discussion

Defendant seeks leave to appeal the bankruptcy
court's ruling under both 28 U.S.C. § 158(a)(1) and
(a)(3). Because this court grants Defendant's request
for leave of court to file an appeal under § 158(a)(3),
§ 158(a)(1) need not be addressed. Section 158(a)(3)
states that the "district courts of the United States
shall have jurisdiction to hear appeals ... with leave of
court, from other interlocutory orders and decrees."
That section provides no guidelines as to when a
district court should grant leave to hear an appeal, but
other courts have looked to the standards set forth in
28 U.S.C. § 1292(b), which provides for
discretionary interlocutory appeals from the district
courts to the courts of appeals. In re Dino's Inc., 183
B.R. 779, 781 (S.D.Ohio 1995).

Section 1292(b) provides that an interlocutory appeal
may be granted when: (1) there is a controlling
question of law, (2) there is a substantial ground for
difference of opinion, and (3) an immediate appeal
may materially advance the ultimate termination of
the litigation. Ahrenholtz v. Bd. of Trustees, 219 F.3d
674, 675-76 (7th Cir.2000). Because this case meets
all these criteria, this court will grant Defendant's
Motion for Leave to Appeal. First, Defendant's
motion to dismiss raised six issues of law, ranging
from applications of res judicata to questions of
interpretation of the bankruptcy and tax laws. Several
of these are "pure" questions of law, or are
"question[s] of the meaning of a statutory or
constitutional provision, regulation, or common law
doctrine." Id . at 675. Also, there is a substantial
ground for difference of opinion on these issues as
evidenced by the case law support found by
Defendant and the bankruptcy judge's contrary
opinion. Finally, if Defendant is correct about these
matters, its motion to dismiss will be granted and
provide a quick resolution to the litigation.
Furthermore, many of the issues presented by this
appeal are only tangentially related to bankruptcy law
and therefore fall outside of the specific area of
expertise of the bankruptcy court.


III. Conclusion

*2 For the foregoing reasons, the Defendant's Motion
for Leave to Appeal is GRANTED. The adversary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 535316 (S.D.Ind.), 89 A.F.T.R.2d 2002-1619
**(Cite as: Not Reported in F.Supp.2d)**

proceeding is hereby stayed until further order from
this court. The briefing schedule outlined in
Bankruptcy Rule 8009 is now in effect. Appellant has
fifteen days from the date of this entry to file its brief.

S.D.Ind.,2002.
In re Beatty
Not Reported in F.Supp.2d, 2002 WL 535316
(S.D.Ind.), 89 A.F.T.R.2d 2002-1619

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1909912 (N.D.Tex.), 86 A.F.T.R.2d 2000-7255
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
In re Tomlin.N.D.Tex.,2000.
United States District Court, N.D. Texas.
In Re: Daniel Otis TOMLIN Jr., Debtor.
UNITED STATES OF AMERICA, Plaintiff,
v.
Daniel Otis TOMLIN Jr., Defendant.
**Nos. Civ. 3:00-CV-1161-T, 3:99-35175-HCA-7.**

Nov. 21, 2000.

*ORDER GRANTING MOTION FOR LEAVE TO
APPEAL INTERLOCUTORY ORDER*
MALONEY, J.
**\*1** Before the Court is the Motion for Leave to
Appeal to the United States District Court, filed on
June 2, 2000, by Defendant Daniel Otis Tomlin Jr.
After consideration, the Court concludes that the
motion should be granted.

Defendant Daniel Otis Tomlin Jr., filed the instant
motion for leave to appeal an interlocutory order
entered by the United States Bankruptcy Court for
the Northern District of Texas, pursuant to 28 U.S.C.
§ 158(a)(3). Defendant seeks an appeal to this Court
of the bankruptcy court's order denying his motion to
dismiss the adversary proceeding against him by
Plaintiff United States of America (Internal Revenue
Service).

Specifically, Defendant contends that Plaintiff does
not have standing to bring the adversarial proceeding
against him because, as the executor of his father's
estate, he does not owe a fiduciary duty to Plaintiff to
pay federal estate taxes. Thus, because he does not
owe a fiduciary duty for purposes of 11 U.S.C. §
523(a)(4), Plaintiff does not have standing to bring
the adversary proceeding. The bankruptcy court
denied Defendant's motion to dismiss, thereby
implicitly concluding that Defendant owed a
fiduciary duty to Plaintiff.

It is well settled that leave to appeal an interlocutory
order of a bankruptcy court should be granted only in
unique circumstances, which justify transcending the
general rule that such appeals should not be allowed.
In re Hunt Int'l Resources Corp., 57 B.R. 371, 372
(N.D.Tex.1985). While the United States Court of
Appeals for the Fifth Circuit has not expressly
adopted criteria for determining whether to grant

leave to appeal under 28 U.S.C. § 158(a)(3), it
recognizes that many district courts have adopted the
standard applied under 28 U.S.C. § 1292(b)
(interlocutory appeals to courts of appeals) for
interlocutory appeals from bankruptcy court orders.
Ichinose v. Homer Nat'l Bank, 946 F.2d 1169, 1177
(5th Cir.1991). Thus, to be appealable under §
158(a)(3), an interlocutory order of the bankruptcy
court must: (1) involve a controlling issue of law; (2)
present a question upon which there is substantial
ground for difference of opinion; and (3) an
immediate appeal of the order must materially
advance the ultimate termination of the litigation. Id.

Plaintiff concedes that the issue of standing is a
controlling issue of law, and that an immediate
appeal of the bankruptcy court's order will materially
advance the ultimate conclusion of the litigation.
Thus, there is no dispute that factors one and three
are present in this case. Plaintiff argues, however,
that the question of whether an executor owes a
fiduciary duty to a tax creditor does not present a
question upon which there is substantial ground for a
difference of opinion.

Plaintiff refers the Court to specific sections of the
Texas Probate Code, which state that an executor
shall hold the estate of the decedent in trust and shall
pay or reject the claims of creditors. See Tex.
Prob.Code Ann. § 37 and § 146. Plaintiff also cites
jurisprudence, the great majority of which was
decided more than fifty years ago, which also
indicates that the executor holds the property of the
estate in trust for the benefit of creditors. However,
the cited cases obliquely refer to the executor's duty
to hold the estate in trust. They do not indicate
whether the fiduciary duty to pay tax creditors inures
to the benefit of those creditors, or whether that duty
only extends to the estate, to which the executor
ultimately answers. Therefore, it is not settled that an
executor owes fiduciary duties to all "persons
interested" in the estate. See Tex. Prob.Code Ann. §
3(r). There is no current authority that addresses the
precise issue. Accordingly, the Court concludes that
there is substantial ground for a difference of opinion
on the controlling question of Texas law, with respect
to the extent of fiduciary duties owed by an executor.
Having met the three factors set forth in Ichinose,
Defendant's interlocutory appeal should be granted.

**\*2** It is therefore ORDERED that the Motion for
Leave to Appeal to the United States District Court,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1909912 (N.D.Tex.), 86 A.F.T.R.2d 2000-7255
**(Cite as: Not Reported in F.Supp.2d)**

filed on June 2, 2000, by Defendant Daniel Otis
Tomlin Jr., is granted.

It is FURTHER ORDERED that the parties shall
submit their briefs in accordance with the Federal
Rules of Bankruptcy Procedure and the local rules of
this Court.

N.D.Tex.,2000.
In re Tomlin
Not Reported in F.Supp.2d, 2000 WL 1909912
(N.D.Tex.), 86 A.F.T.R.2d 2000-7255

Briefs and Other Related Documents (Back to top)

• 3:00cv01161 (Docket) (Nov. 21, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

0 7    1 2

## APPEAL TRANSMITTAL SHEET

Case Number: _03-50003_ ___ ___    ○BK    ◉AP
If AP, related BK Case Number: _01-0706_ ___ ___

⬡ 🗐 ⋔ Ⅵ 🗐

JAN 2 3 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Title of Order Appealed:
_Order Granting in Part Debtor's Motion for Partial Summary Judgment, etc._
Docket Number: _73_____    Date Entered: _12/7/06_____ ___

Item Transmitted:    ◉ Notice of Appeal                    ◉ Motion for Leave to Appeal
                     ○ Amended Notice of Appeal             ○ Cross Appeal
                     Docket Number: _75_____              Date Filed: _Dkt 77 12/18/06_____

*Appellant/Cross Appellant:                  *Appellee/Cross Appellee
_AOL_____ ___ ___ ___ _____            _EBC_ ___ ___ ___ ___ ___ ⬛

Counsel for Appellant:                       Counsel for Appellee:
_Christina M. Thompson_____ ___    ⬛    _Thomas W. Briggs_____
_The Nemours Building_____ ___    ⬛    _Morris Nichols Arsht & Tunnell_____
_1007 North Orange St., P.O.Box 2207_    ⬛    _1201 N. Market Street_____ ___ ___
_Wilmington, DE 19899-2207_____    ⬛    _Wilmington, DE 19801_____ ___ ___

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?    ◉Yes    ○No

IFP Motion Filed by Appellant?    ○Yes    ◉No

Have Additional Appeals to the Same Order been Filed?    ○Yes    ◉No
If so, has District Court assigned a Civil Action Number?    ○Yes    ◉No    Civil Action # _____ ___

Additional Notes:

_1/23/2007_____ ___              By: _____ _M. E. Behornar_____ ___ ___
Date         .                              Deputy Clerk

FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____ ___ ___
7/6/06

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re EBC I, f/k/a ETOYS, INC., | Chapter 11 |
|         Reorganized Debtor. | Case No. 01-0706 (MFW) |
| EBC I, f/k/a ETOYS, INC., | |
|         Plaintiff, | Adv. Proc. No. 03-50003 (MFW) |
|    v. | |
| AMERICA ONLINE, INC., | |
|         Defendant. | |

**(PROPOSED) ORDER GRANTING MOTION FOR LEAVE TO APPEAL**

Upon consideration of the Motion for Leave to Appeal filed by defendant America Online, Inc., it is this ___ day of _____, 200__, ORDERED that the defendant's Motion for Leave to Appeal from the Bankruptcy Court's December 7, 2006 Opinion and Order entering summary judgment in favor of the plaintiff on Count I of the Complaint is GRANTED.

It is further ORDERED that the parties and the clerk shall proceed with the appeal pursuant to the timeframes set forth in the applicable rules, with the date of this Order deemed to establish the initial date of filing of the notice of appeal.

SO ORDERED.

_____
United States District Judge